## Little v. Commonwealth.

(Decided October 9, 1917.)

### Appeal from Breathitt Circuit Court.

1. Criminal Law—Verdict.—A verdict of guilty in a criminal case cannot be set aside as not being sustained by the testimony if there is any testimony to support it and it is not flagrantly against the evidence.

2. Criminal Law—Evidence—Instructions.—If the Commonwealth, by way of refreshing the memory of a witness, asks its witness if he did not make a certain statement out of court, which the witness denies, and no one testifies in contradiction of the witness that such statement was made, this does not amount to a contradiction of the witness and the court need not instruct the jury or admonish it as to the effect of such contradicting testimony as is required when it is introduced.

3. Criminal Law—Evidence.—Evidence examined and held that it was sufficient to authorize the jury to find the defendant guilty of the crime of murder, for which he was being tried.

W. H. BLANTON, A. S. JOHNSON, A. H. PATTON and HAZEL-RIGG & HAZELRIGG for appellant.

CHARLES H. MORRIS, Attorney General, and D. M. HOWERTON, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant was tried in the Breathitt circuit court upon the charge of willfully murdering Mitchell Crawford, and his punishment fixed at confinement in the penitentiary during his natural life. To reverse the judgment pronounced upon the verdict he prosecutes this appeal.

Numerous complaints of the verdict and judgment were incorporated in the motion for a new trial, but they all appear to have been abandoned upon this appeal except, (1) incompetent testimony alleged to have been given by the Commonwealth's witness, John Anderson, and (2) that the testimony was not sufficient to authorize the submission to the jury or the conviction of the defendant of the crime of murder.

A substantial statement of the facts are that the defendant is 27 years of age, and the deceased only 17 years old, the latter being a person of color. John Anderson is the father-in-law of the appellant, and lives in Breathitt county, near where Old Buck creek empties into a prong of the Kentucky river. Some time in the forenoon, perhaps between nine and ten o'clock, on the day of the homicide (which was Sunday), the defendant went to the house of his father-in-law, John Anderson, on a mission, as he claims, of buying some geese. He left home with some whiskey, some of which he drank on the way, and gave some of it to his father-in-law after arriving at the latter's house, and they also drank of some brandy which the father-in-law had in his house. After some time spent in this way, some one suggested that they go to the barn located some distance from the house, and appellant went out in the yard to talk with one Turner, and after finishing that conversation he started toward the barn, calling to his father-in-law to follow him. Just before, or about that time, the deceased appeared in the house of John Anderson, and when the latter started to the barn the deceased followed along;

and after the three got to the barn something was said about some chewing tobacco and deceased remarked that he had a twist at his house, which was not far away, and that he would go and get it, which he did. However, before this was done, some more drinks were taken by both Anderson and the appellant, and perhaps the deceased, after arriving at the barn. When the tobacco was brought the deceased sold half of it to John Anderson for a nickel, and it was proposed by some one (but by whom the proof is not clear) that deceased and appellant play cards to determine who should have the other half of it. The appellant would not agree to this, and, according to the testimony of John Anderson, he finally "cussed him (deceased) and told him he didn't want the G—— d—— old tobacco, or something to that amount." In the meantime, the drinking continued, but after the dispute as to whether the game of cards would be played for the tobacco the witness, Anderson, proposed that they go to the mouth of the creek, which was on the way to the house, as time for the noonday meal was approaching. In leaving the barn the witness, Anderson, was in front, followed by appellant, who in turn was followed by the deceased. Anderson does not state what was said, but he heard a conversation between the two which he terms "yaggering." It is not explained what he means by that term, but we suppose that it was some general talk passing between the two such as occurs between persons more or less intoxicated. About the time they arrived at the gate to go into the road, which was a very short distance from the barn, a pistol fired, and the witness, Anderson, turned to see what was the matter. He describes the parties as facing each other, but, according to his recollection, neither had hold of the other; two more shots were fired by the appellant, after which he got on his mule and rode away. Two of the shots were fired into the left side of the deceased, and the other was through his head, instantly killing him. Mrs. Anderson, who was in the kitchen preparing dinner, heard the first shot and ran to the door, and it appeared to her that the parties had hold of each other and that appellant was trying to get loose from the deceased, but he fired the last two shots after the witness saw them. Kelly Anderson, a seven-year-old boy of John Anderson and wife, testified that he was up the road a short distance from the barn getting some stovewood, and that he heard the appellant say to witness' father, "John, do you want to see a negro

die?" and that appellant thereupon fired the shots which killed the deceased. This witness also testified that after the first shot the deceased said, "Breck, what did you want to shoot me for?"

The version of the appellant as to how the homicide occurred, as told by himself on the witness stand, is:

"Well, I was over at John Anderson's to buy some geese and hogs from Ronan Judd; I went over there, and I had some whiskey, and John had a little; I think I had drank that much in a pint bottle (witness indicates), three or four drinks I drank and me and John was up at the barn and the negro wanted to play cards for some tobacco and I told him I wouldn't play with him for the tobacco, and he said the tobacco was up at home, and he wanted to play there for the tobacco, wanted to play cards for the tobacco, and I told him I didn't want to play for it, that I had something else to see about, that I had some geese to take down to that fellow, Ronan Judd, and he says, 'By God, you will play for it as quick as I go up home and get it,' and I said, 'I don't aim to,' and he took right out the road and went and got the tobacco and come back, but when he started I said, 'Mitch, you needn't go after it for I won't play nary game with you,' and he went right on and got the tobacco and came back and tried to get me to play for it, and said, 'God damn you to h—— you will play for it,' and I wouldn't, and about that time John Anderson said, 'Let's go down to the house or down the river,' I forget which, and I said, 'All right,' and John goes right out the gate and I goes out behind him and as I started out the gate Mitch struck me there and cut my galluses or shirt and grabbed me by this arm and went to cutting me and I jerked my pistol and shot him right there and shot him loose, and when I shot him loose I wasn't aiming to shoot at him no more, and he grabbed at me and throwed the knife at me, and grabbed a big club and grabed me, come right on to me, and I looked back and jumped back and shot him twice and went right on down the river."

He says that on his way home, about twenty or twenty-five minutes after the killing, he met two persons to whom he showed the cut places in his shirt and suspenders, to which he called their special attention, and each of them testify that they closely inspected the appellant's garments and found the rent places in his shirt, which was exhibited to the jury, and which the witnesses had before them. It is also shown by another witness intro-

duced by appellant that about five days after the homicide he found an open knife lying beside the road close to the place where the homicide is alleged to have occurred. This witness is a tenant of a relative of appellant, and claims that he was on a mission of buying chickens at the time he found the knife, although he neither purchased any chickens nor asked anyone concerning the purchase of chickens on the entire trip of several miles.

Some witnesses testify to a number of tracks in the road about where the deceased fell, and express their opinion that the appearance indicated a scuffle of some kind, but before these witnesses arrived a number of persons had gathered at the scene and could have made the tracks testified to by the witnesses. No one saw any weapon of any character either upon or in the hands of the deceased, nor was any weapon found immediately following the killing, although some of the witnesses made at least a casual inspection of the premises for that purpose.

Upon this testimony it is insisted that no motive is shown for the willful and malicious killing of the deceased, and that the murder instruction should not have been given. We are referred to a number of cases from this court announcing the rule that the burden to establish the defendant's guilt in a criminal prosecution rests with the Commonwealth throughout the case, never shifting from it to the defendant. Farris v. Commonwealth, 14 Bush 362. But this rule, which is eminently proper and sound, has no application here, as the question now presented is whether the evidence was sufficient to justify the jury in finding the appellant guilty of murder under the rules governing criminal practice in this Commonwealth.

It is true that one, in order to be guilty of murder, must do the killing with malice aforethought, but it has been the long-established and unbroken rule in this state that "malice aforethought" means a predetermination to commit the act of killing without legal excuse, and it is immaterial at what time before the killing such predetermination was formed. Turner v. Commonwealth, 167 Ky. 365.

Although the witness, Kelly Anderson, is shown to have been promised a red jacket, a pair of overalls, and some candy, if he would tell the jury the statement which he attributes to the appellant, "John, do you want to

see a negro die?" still, he is not shown to have been offered anything to tell about the inquiry which deceased made of appellant after first being shot, "Breck, what did you want to shoot me for?" The promise made to the witness is of an impeaching nature, and goes only to his credibility.

The Commonwealth's witness, John Anderson (who was an unwilling one for the Commonwealth), shows that appellant was angry at the deceased before leaving the barn, using toward him profane language. The absence of any weapon found upon the premises immediately after the shooting, the incredible story of the appellant about the deceased cutting at him and slashing his shirt in a number of places without grazing his body anywhere, and the flimsy excuse for having the pistol, are all facts which the jury was entitled to weigh, and from them to determine whether the little boy told the truth when he testified to the statement made by appellant, "John, do you want to see a negro die?"

At most, the testimony upon the issue as to whether the killing was under such circumstances as constituted murder was contradictory, and peculiarly for the determination of the jury. Upon the point argued that no motive for the killing is shown it might be equally as well said that there was no motive shown for the alleged assault upon appellant by the deceased. The verdict of the jury finding the defendant guilty of murder is neither unsupported by the evidence nor is it palpably against it, and the court did not commit error in the matter complained of.

It is insisted that the Commonwealth was wrongfully permitted, over the objections of the appellant, to contradict its witness, John Anderson, and that if such contradiction were permissible under the criminal practice the jury should have been instructed that the contradictory testimony could be considered by it only for the purpose of contradicting the witness, under the rule held in the cases of Jones v. Commonwealth, 20 Ky. Law Rep. 355; Collins v. Commonwealth, 23 Ky. Law Rep. 743; Mullins v. Commonwealth, idem. 2433; Ashcraft v. Commonwealth, 24 Ky. Law Rep. 488; and Alford v. Commonwealth, 26 Ky. Law Rep. 153. The trouble with this contention is that what occurred did not amount to a contradiction of the witness. The matter complained of is a part of the examination by the Commonwealth's attorney of a reluctant witness, which is as follows:

"Q. Just before Breck shot, what did Breck say to him or to you? A. Not a word, sir, as I remember of; they were just walking along there and they was kindly in a yagger, but I wasn't paying any attention, for he was in his shirt sleeves and I couldn't see no sign of a pistol. Q. To refresh your recollection, didn't Breck say, 'John, don't you want to see a nigger die'? A. Well, if he did I didn't hear it; I didn't pay any attention. Q. Didn't you tell me and Mr. Byrd and South Strong down in the county attorney's office that he said that or that in substance? . . . Q. Do you remember telling us that in the county attorney's office? A. Well, yes, I believe I did say something about just what I told just now, my recollection."

It will thus be seen that the witness never acknowledged making the statement attributed to him, neither at the attorney's office nor elsewhere, nor did any witness testify that such statements were made as indicated in the question. This being true, there is no room for the application of the rule of the cases, *supra,* concerning the duty of the court to admonish the jury as to the purpose of such testimony. We are not called upon to determine whether the Commonwealth had the right to contradict or impeach its witness, Anderson, under the provisions of section 596 of the Civil Code of Practice, since what occurred, as we have seen, constituted neither an impeachment nor a contradiction of the witness. He expressly admitted in the quoted examination that he stated nothing in the office of the attorneys for the Commonwealth except that to which he had just testified.

Owing to the gravity of the crime, and the severity of the punishment, we have given this record close consideration and have failed to find any error prejudicial to the substantial rights of the defendant. It seems to be a case where two arch enemies to the peace and happiness of humanity (whiskey and a pistol) met, and, co-operating, produced what is too often the case, a homicide. While we might sympathize with the unfortunate defendant because of the condition into which his conduct has brought himself, we do not think that the reasons assigned and urged for a reversal of the judgment are sufficient for that purpose.

Wherefore, the judgment is affirmed.