## Johnson v. Commonwealth.

(Decided February 1, 1918.)

### Appeal from Franklin Circuit Court.

1. Criminal Law—Conduct of Jury—Trial.—Where some of the jury in a criminal case entered a store and bought tobacco, and others conversed briefly with friends upon the street, and all of said acts and conversations were within the presence of the sheriff and the other jurors and the conversations had no relation to the case upon trial, the defendant was not prejudiced and the trial court properly refused to discharge the jury.

2. Trial—Instructions.—An instruction should not be given when there is no evidence upon which to base it.

3. Criminal Law—Appeal and Error—Malice Aforethought.—It is not a reversible error in a criminal case for the trial court to fail to give an instruction defining "malice aforethought."

4. Criminal Law—Trial—Instructions.—Where, in a trial for murder the court gave an instruction on murder and another instruction on manslaughter, and the jury found the defendant guilty of manslaughter, the failure of the court to instruct the jury that if it had a reasonable doubt as to whether the offense committed was murder or manslaughter they should find the defendant guilty of the lesser offense, did not constitute a prejudicial error.

5. Criminal Law—Trial—Submission to Jury.—Where there is any evidence, however slight, tending to show the guilt of the accused the case should go to the jury.

SCOTT & HAMILTON and L. F. JOHNSON for appellant.

CHARLES H. MORRIS, Attorney General and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

Humbert Crutcher and the appellant, Maria Johnson, colored persons living in Frankfort, were jointly indicted for the murder of William Johnson, the husband of Maria. They were tried separately and both were convicted; Crutcher receiving a term of 21 years and Maria a term of five years in the penitentiary. She appeals.

William and Maria were married in 1902, and got along as man and wife fairly well until Humbert Crutcher began paying attention to Maria, which resulted in an illicit intimacy between them. Becoming jealous, William Johnson left Frankfort in February, 1917, and went to Cleveland, Ohio, with the purpose of residing there. He wrote Maria several letters from Cleveland saying he never expected to return to Kentucky, and upbraiding her because of her relations with Crutcher. In his last

letter, however, he said he would return to Frankfort on March 25th. He returned, however, on March 23rd, two days earlier than was expected.

Upon his arrival in Frankfort, William Johnson sought out his two brothers, John and Ben Johnson. About 9 o'clock on the night of March 23rd he sent his brother Ben to the cottage in South Frankfort where he and Maria had lived, to find out who was there. When Ben arrived at the house he went to a side window and looked in, and found that Humbert Crutcher, Maria Johnson, John Kaufman and Fannie Johnson were in the house playing cards. Ben reported to his brother accordingly. Ben, John, and William Johnson then went to North Frankfort and found police officer Shields and asked him to go with them to the Johnson house in South Frankfort; and Shields and Scott, another police officer, returned with them to the Johnson house. John Johnson stopped a square or two before he reached the house to hitch his horse. It was then about 11 o'clock at night.

When Ben and William had approached to within about 100 feet of the house they requested the policemen to stop and let them go to the house. The policemen did so and Ben Johnson went to the back door while William Johnson went to the front door. John Kaufman and Fannie Johnson were standing on the front porch of the house, and after asking who Kaufman was, William Johnson rushed past them and into the house. The house contained four rooms, one directly back of the other. When Ben Johnson started to go to the rear of the house, Fannie Johnson, who was a sister of Maria Johnson, called to her, saying that Ben was going towards the back of the house. Maria and Crutcher were in the third room. Maria left Crutcher and went to the back porch and had a short conversation with Ben Johnson. By that time William Johnson had gone into the house through the front door and Crutcher had retreated to the kitchen, which was the rear room. Up to this point there is little or no conflict in the testimony.

Crutcher testified that William Johnson advanced from the room next to the kitchen with a pistol in his hand and began to shoot at Crutcher as soon as he got into the kitchen; Crutcher at that time being against the back door. Crutcher further testified that Maria came back through the kitchen and went to the front part of the house and tried to keep William from going to the

kitchen, and that she came into the kitchen with him where the shots were fired. Maria testified that she stayed on the back porch until after the shooting commenced; that just as she opened the door to go back into the house Crutcher rushed past her going out; that as she stepped into the kitchen William was sinking to the floor with a pistol in his hand pointing toward her; that she attempted to catch hold of him and did catch him in her arms; and that just as she caught him the pistol was discharged, making a flesh wound in her hand. William sank to the floor and died almost immediately from a bullet that penetrated his skull.

Ben Johnson testified that while he was talking to Maria at the back door he saw a man standing in the kitchen behind the open door with a pistol in his hand, and that the door then closed and the shooting commenced. The policemen rushed into the house immediately after the shooting and testified that they found Maria standing over the body of her dead husband in the kitchen with a smoking revolver in her hand, and that she told them William had committed suicide. Maria, however, contradicted the policemen upon this point. There was no one else in the room.

As Crutcher escaped out the back door Ben Johnson struck him over the head with a plank, which caused Crutcher to drop the 32 caliber pistol used by him in the shooting affray. The pistol was subsequently found lying on a pile of dirt over which Crutcher had stumbled in making his escape. If Crutcher's story is true, William and Maria Johnson and Crutcher were the only witnesses to the shooting. All the witnesses testified, however, that within a few seconds after William entered the front door the shooting began.

When William Johnson left Frankfort to go to Cleveland he left his 32 caliber pistol on the dresser in one of the front rooms of his house, and Crutcher took his pistol and carried it to the kitchen. Crutcher and Maria were indicted and tried as principals with the result above indicated.

Maria assigns the following four grounds for a reversal of the judgment against her: (1) The jury was permitted to separate from one another and converse with persons other than members of the jury; (2) the court failed to give the whole law of the case; (3) the instructions given were erroneous; and (4) her motion for a peremptory instruction to the jury to find her not guilty

made at the close of the Commonwealth's proof, should have 'been sustained. We will consider these grounds in the order named.

1. It is contended that while the jury was in charge of Sheriff Smith one of the jurors was permitted to converse with a person other than a member of the jury, and two or more of the jury were permitted to enter a drug store and thereby separate themselves from the remaining members of the jury. Upon affidavits filed a motion was made to set aside the swearing of the jury for this reason, but the court overruled the motion. The affidavits filed by the appellant show that Conway and another member of the jury left the other jurors and went into a drug store out of the sight of the other jurors and the sheriff; that juror Lewis engaged in conversation with Stanzall, who was not a member of the jury; that juror DeWitt subsequently left the other members of the jury and went into a drug store out of the sight of the sheriff and the other jurors; and that juror Howard went across the street and engaged in conversation with Graham.

While it is not charged than anything improper was said or done by any of the jurors or persons concerning the case, appellant insists that the acts shown were in violation of sections 244 and 245 of the Criminal Code of Practice and the decisions of this court thereunder holding that although the case was not discussed between the jurors and other persons, and no juror did anything culpable, nevertheless, the jury should have been discharged because an opportunity was presented for the jurors to discuss the case with strangers, or other persons, if they had been so minded. See Vinegar v. Commonwealth, 104 Ky. 108, and Campbell v. Commonwealth, 162 Ky. 107, announcing the general doctrine as above suggested.

The Commonwealth filed the affidavit of Smith, the sheriff in charge of the jury, and also the affidavits of jurors Howard, DeWitt, Herndon, Thompson and Conway. It is there shown that the conversation between Lewis and Stanzall was in the presence of and within view of the other jurors, and related solely to the whereabouts of Lewis' son, who had no connection with the case. Smith further states that he permitted two of the jurors to go into a drug store and get some tobacco, but that they were at all times within his view and in the view of the other jurors and that they had no conversa-

tion with any one, except in calling for the tobacco they bought; and that no other jurors left his presence or the presence of the jury.

Juror Howard stated that he met his friend Graham as he and the other jurors were crossing the street; that he shook hands with Graham, merely saying to him that he would perform a certain errand the next time he came from Versailles; and that he did not stop walking and was not out of sight of the sheriff or the other jurors. Howard and DeWitt, the two jurors who bought the tobacco in the drug store, say they were not out of the sight or hearing of the sheriff or the other jurors, and that they did not speak to any one concerning the case. DeWitt corroborated Howard; and Herndon, Thompson and Conway corroborated the other members of the jury.

From a reading of the affidavits it appears that the jury was at all times in the presence of Smith; that the jurors were never separated from each other; and, that nothing prejudicial to the rights of the appellant occurred.

Furthermore, it will be seen that the facts of this case differ radically from those in Campbell v. Commonwealth, *supra,* where the sheriff in charge of the jury went with one of the jurors some three hundred yards to an ice cream parlor and ate ice cream with him, leaving the rest of the jury scattered about a hotel, and in charge of no one. Similar facts showing that the jury had been separated appeared in Vinegar v. Commonwealth, *supra.* But in the case at bar it satisfactorily appears that the jurors were kept together; that nothing happened that could have prejudiced the appellant; and, that no opportunity was given for any wrong doing. The court properly refused to discharge the jury. Deacon v. Commonwealth, 162 Ky. 188; Mansfield v. Commonwealth, 163 Ky. 488; Canter v. Commonwealth, 176 Ky. 360.

2. The complaint that the trial court failed to instruct the jury on the whole law of the case is based (a) upon the court's failure to instruct upon the subject of Crutcher's right to defend himself from the real or apparent danger from Ben Johnson and John Johnson, and (b) upon the court's failure to give an instruction permitting Crutcher to shoot William Johnson in defense of Maria.

In support of this first proposition appellant relies upon Tucker v. Commonwealth, 145 Ky. 84; Slone v.

Commonwealth, 33 Ky. L. R. 266, 110 S. W. 235; and Helton v. Commonwealth, 27 Ky. L. R. 1164, 87 S. W. 1073. These cases announce the general rule as contended for by appellant's counsel under which Crutcher would have been justified in defending himself from any real or apparent danger at the hands of either Ben or John Johnson. But the facts in the cases cited were entirely different from the facts of this case, and justified an instruction of the character suggested. And, it has been held many times by this court that it is neither necessary nor proper to give an instruction unless there is some evidence upon which to base it. In this case there is no claim by Crutcher that he was in any danger from either Ben or John Johnson; indeed the proof shows that Crutcher did not know they were upon the premises. He heard William Johnson when he entered the front door of the house and knew him by his voice, and Crutcher then retreated to the kitchen as William Johnson came through the front rooms of the house. Crutcher did not come in contact with Ben Johnson until he met him in the back yard as he was leaving the house, and John Johnson was not upon the premises until after the shooting was over.

In O'Hara v. Commonwealth, 164 Ky. 403, the court said there was no evidence sufficient to require a self-defense instruction to include a danger to defendant from a companion of the deceased, where there was no act or demonstration upon the part of such companion as reasonably indicated an impending purpose to harm the defendant.

In answer to the second proposition that the court should have given an instruction which would have justified Crutcher shooting in the defense of Maria, it is sufficient to say there is no evidence that indicates that William Johnson attempted to injure Maria. Crutcher testified; and he did not claim that William Johnson made any attack, demonstration or threat against Maria; and, she testified without making any such claim. On the contrary, she testified that she was on the back porch when William entered the front door, and that she was not in the house at the time of the shooting. And, although Crutcher claims she was in the house, he says she was not in the room where the shooting occurred.

It will be seen, therefore, that there was no evidence from any witness even tending to show that there was any attempt on the part of William Johnson to in-

jure Maria, and the court properly refused to instruct upon that phase of the case. Curtis v. Commonwealth, 160 Ky. 727; Nicoll v. Commonwealth, 169 Ky. 491.

3. Under the heading that the instructions given were erroneous it is insisted that the court erred in failing to define "malice aforethought" as used in instruction No. 1, and that the court further erred in failing to instruct the jury that if it had a reasonable doubt as to whether the offense committed was murder or manslaughter they should find the defendant guilty of the lesser offense.

It has been repeatedly held by this court that while it is good practice to define the term "malice aforethought" when used in instructions, a failure to do so is not a reversible error because the failure is more apt to be prejudicial to the Commonwealth than to the defendant. Collier v. Commonwealth, 160 Ky. 338; Nicoll v. Commonwealth, 169 Ky. 491.

It is true the trial court did not instruct as to the degree of the offense committed, whether murder or manslaughter; but it gave an instruction upon murder and another instruction upon manslaughter, and the jury found the appellant guilty of manslaughter, which was the lesser offense of the two. Consequently the failure of the court to instruct upon the degree of the offense, as between murder and manslaughter, was a harmless error, if error at all, and could not have prejudiced the substantial rights of the defendant. She did not claim that she acted in self-defense; on the contrary she denied that she participated in the affray.

4. Finally, it is insisted that the appellant's motion for a peremptory instruction to find her not guilty, and made at the close of the Commonwealth's evidence, should have been sustained because, as she contends, there was no proof tending to show that she had anything to do with the killing of her husband. It is true she testified, and in this respect she is uncontradicted, that she was on the porch during the shooting and had nothing to do whatever with the killing, but that she caught her husband as he was falling; and Crutcher testified that she was not in the room when the shot was fired that killed William Johnson. But it was shown by at least two witnesses that when the policemen, and perhaps others, rushed into the room immediately after the shooting appellant was found standing over the body of her dying husband with a

smoking pistol in her hand. She says she took the pistol from her husband to keep him from injuring her, but the jury had the right to consider all of the facts, including the acts of the parties at the time.

Furthermore, it clearly appears that the appellant had illicit relations with Crutcher which led to the estrangement; that her husband left her on that account and, when he returned to Frankfort he found Crutcher in his home with Maria; and that she had frequently used opprobrious words in referring to her husband, saying she would kill him, or using words to that effect. As an instance, Ben Johnson testified as follows, as to what happened when William entered the kitchen:

"Q. Tell what happened? A. It was but a few seconds until Willie, my brother, stepped in the house with his overcoat and hat on, and he came about half way across this room and Maria made a grab at him and says, 'God dam you, I will kill you'; and it seemed like the fellow behind attracted Willie's attention, and she grabbed him and they scuffled and the door became closed next to me, and in about a second they began shooting—just pop! pop! pop! pop! and it was all over in a few seconds.

"Q. Up to the time the door was closed no shots had been fired at all? A. No, sir.

"Q. Then what did you do? A. I rushed in the house.

"Q. What did you see when you got in there? A. Willie lying on the floor dying, with blood gushing out of his nose and mouth, and Maria standing at his side with a smoking revolver in her hand.

"Q. Were the policemen in there? A. Yes, sir.

"Q. Did she make any statement? A. She said: 'Willie committed suicide—he shot himself.' She said there was no one there but her.

"Q. What else did she say? A. She says, 'You slipped him in here and you see what he got; there he lies, the s—n of a b—h.'

"Q. Did she say anything else? A. She went on to say there was nothing in him, and nothing in any of us; and, she put her hands on her hips and said, 'I am a perfect lady.'"

The coroner testified that Ben Johnson showed him where he had knocked Crutcher down, and that he found a blue steel revolver sticking in the ground; that he

picked it up and Maria said, ''What have you found''?
That he answered,''Never mind''; whereupon Maria said,
''I know what it is—it is a gun.'' The coroner further tes-
tified that Maria stoutly denied that Crutcher had been
in the house. The coroner took money and letters off of
the body of William Johnson but found no weapon upon
him. He also corroborated Ben Johnson's testimony that
Maria said the Johnson boys ''had rushed William in
there, and that is what they got.''

Where there is any evidence, however slight, tending
to show the guilt of the accused the case should go to the
jury. Gordon v. Commonwealth, 136 Ky. 508; Ockerman
v. Commonwealth, 176 Ky. 753. Certainly there was some
evidence tending to connect the appellant with the shoot-
ing of her husband, and that being true it was for the
jury to say what effect should be given it.

Furthermore, under section 340 of the Criminal Code
a reversal will not be granted when, upon an examination
of the whole record, it shows no error was committed to
the prejudice of the substantial rights of the accused.
Kavanaugh v. Commonwealth, 172 Ky. 799. We find no
prejudicial error upon the part of the trial court, and the
verdict is not palpably against the weight of the evidence.

Judgment affirmed.