## Barnes v. Commonwealth.

(Decided March 12, 1918.)

Appeal from Daviess Circuit Court.

1. Homicide—Trial—Peremptory Instructions.—In a prosecution for homicide, the evidence of guilt being circumstantial and conflicting, that question was properly submitted to the jury.

2. Homicide—Evidence—Admissibility.—Evidence of domestic difficulties and of explanations given by the husband leading up to them was competent to show motive and the feeling of the accused toward his wife, for whose murder he was indicted.

3. Homicide—Evidence.—In such prosecution, evidence that a female witness was seen entering the house of an immoral woman was irrelevant to impeach the character of the witness, or to contradict her, she having admitted delivering butter and milk at such place.

4. Homicide—Evidence.—Certain conversations of witnesses were inadmissible to contradict other witnesses.

5. Homicide.—Evidence that witness was in the habit of drinking intoxicating liquors to excess was inadmissible.

6. Homicide—Trial—Instructions—Whole Law of Case.—In a prosecution for homicide, the court gave instructions upon murder, reasonable doubt, and defining technical terms used, and these covered the whole law of the case, there being no other issues made by the evidence.

7. New Trial—Misconduct of Jury.—In such prosecution, where two of the jurors were out of the presence of the sheriff and other jurors for a few minutes only and did not then engage in conversation with outsiders or discuss the case among themselves, such misconduct was not prejudicial.

8. New Trial—Waiver.—Where misconduct of the jury was known to the defendant before verdict and not presented to the court until after verdict in a motion for a new trial, defendant waived his right to rely upon such misconduct for a new trial.

9. Attorney and Client—Knowledge.—Knowledge of an attorney is knowledge of the client whom he represents.

10. New Trial—Attorney and Client—Presumption.—In a prosecution for homicide, the attorney for the accused was in possession of information concerning misconduct of the jury, and it was his duty to impart that information to his client and to the court before verdict, and it will be presumed that he performed his duty and imparted the knowledge to his client.

11. New Trial—Grounds—Practice.—In criminal and civil cases, the issues as to grounds for a new trial should be made by affidavits of the parties and by supporting affidavits, and then upon motion of either party the court should set a day for hearing, summon the witnesses and orally examine them in open court.

12. New Trial—Newly Discovered Evidence.—In a prosecution for homicide, evidence held not to authorize a new trial upon the ground of newly discovered evidence.

LAVERGA CLEMENTS, CLEMENTS & CLEMENTS, ALBERT B. OBERST and ERNEST ROWE for appellant.

CHARLES H. MORRIS, Attorney General, OVERTON S. HOGAN, Assistant Attorney General and C. E. Smith, Commonwealth Attorney, for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming.

The appellant was indicted, tried, convicted, and sentenced to imprisonment in the penitentiary for life for the murder of his wife, Fema Barnes, and from that judgment is appealing, urging as grounds for reversal that the court erred: First, in overruling his motion for a peremptory instruction; second, in the admission and exclusion of evidence; third, in failing to instruct the jury upon the whole law; fourth, in refusing to grant him a new trial; because of the separation of the jury and because of newly discovered evidence.

1. Defendant and his wife separated in August, 1916, the wife living for a short time in Owensboro at the home of Nellie Blanford, and going from there some time in September to the home of Mr. and Mrs. Fred Racine, who lived about nine miles from Owensboro in the direction of Calhoun, where she remained assisting Mrs. Racine in the work about the house until her murder on November 21, 1916. Defendant had visited his wife at Mrs. Racine's upon several occasions and, on the day before her murder, called Mrs. Racine on the telephone telling her that on the next day he was going to Calhoun to see about doing some painting; that he would kill some rabbits on the way and stop at her home. About eleven o'clock the next morning, defendant arrived at the Racine home on foot, with a rabbit, a 12-gauge, double barrel shot gun, and two pints of whiskey. He and Mrs. Racine cleaned the rabbit and drank some of the whiskey, and defendant ate dinner with Mr. and Mrs. Racine and his wife. After dinner, Racine went to work on the farm, and defendant, Mrs. Racine, and his wife, went hunting on the Racine farm of 140 acres, defendant carrying the double barrel shot gun he brought with him. Mrs. Racine started with her husband's shot gun, which she left at the barn, and later procured a rifle at the home of a relative living near. Mrs. Barnes was unarmed.

There is some evidence that Mrs. Racine was under the influence of the whiskey she and defendant had been drinking, of which Mrs. Barnes did not partake; and there is a conflict in the evidence of Mrs. Racine and that of defendant as to which of them proposed the hunt after dinner and as to the attitude of Mrs. Barnes toward her husband during the day. Mrs. Racine said that Mrs. Barnes was adverse to being with or conversing with defendant, while defendant said his wife was happy in his company, addressed him as "honey," and that they agreed that day that she would join him in Owensboro the next day and resume their marital relations.

Defendant is contradicted by Mrs. Racine, Henry Stengall, and Aldon Terry, in his testimony with reference to a trip by Mrs. Barnes to the spring across the road from the Racine home, shortly before defendant started back to Owensboro about dusk, and as to a razor which defendant had and claimed to have found at the spring, and as to Mrs. Barnes firing two shots from defendant's shot gun. Mrs. Racine also relates that, when Mrs. Barnes returned from the spring, defendant followed her to the back porch where Mrs. Racine was, and that defendant then had both barrels of his shot gun cocked and loaded; that he kept wanting a private conversation with his wife, but she would not go into a room with him; that witness told defendant he had better be going; that he said he would go but also said "I will come back"; that his actions were such as to excite her suspicions to such an extent that, as he left, she removed her shoes and followed him to the end of the porch to see where he went, and, not seeing him when she got to the end of the porch, she went to the front door and looked for him but could see nothing of him. Defendant admitted having the gun cocked at the back porch, when his wife returned from the spring, but denied the gun was loaded or that he knew, until Mrs. Racine called his attention to it, that the gun was cocked.

Shortly after defendant left the house, about six o'clock and after it had gotten quite dark, Mr. and Mrs. Racine and Mrs. Barnes were seated at the table in the dining room, eating supper, Mrs. Racine across the table from and facing an outside window, with Mr. Racine on her left and Mrs. Barnes across from him and on Mrs. Racine's right with her right side toward the window, when both barrels of a double barrel shot gun were dis-

charged simultaneously through the window, striking Mrs. Barnes in the temple, killing her instantly; and, in addition, extinguishing the lamp on the table, breaking many of the dishes, and stunning both Mr. and Mrs. Racine. As soon as they could, they got out of the room, and Mrs. Racine called to Mrs. Barnes. In about five minutes, they and other witnesses, who also heard the louder, heavier first report, heard another shot fired from a shot gun not far from the Racine house. Two empty yellow shells were found next morning not far from the Racine house, but in the opposite direction from Owensboro.

Defendant, after denying that he killed his wife, testified that, after leaving the Racine home while walking along the road to Owensboro, he fell over a culvert and one barrel of his gun was discharged, inflicting what proved to be quite a serious flesh wound in the muscles about his left armpit but which he scarcely noticed at the time; that, when he reached the outskirts of Owensboro and eight or ten blocks from his home, in passing the home of his friend, Tom Mosely, he called, and Mosely answered, got out of bed, and invited him in and to spend the night with him; that it was then about eleven o'clock and he undressed and got in bed with Mosely; that he was not feeling well the next morning and did not get up to breakfast or until about noon. At about two o'clock in the afternoon he was arrested, and he had not mentioned to any one the fact that he was wounded. The officer, who arrested him, testified that when he took hold of defendant's left arm he discovered that his coat sleeve was wet and sticky with blood, and that the sleeve was nearly shot away at the arm pit; that, as soon as he got to the jail, he called the city physician and had defendant's wound dressed. The physician who dressed the wound testified that, while the wound was entirely superficial, "the muscle here of the breast was shot into quite considerably and there were also some wounds back of that and a deep wound was located at a point there (pointing to his body)"; that the part of the muscle "that goes over the pectoralis muscle" was torn away; and that defendant was "a month or so" in recovering.

Mrs. Racine testified that, immediately after the killing she telephoned to the sheriff; that neighbors began to arrive at the house in a short time; that among the first to arrive were "one of the Terrys and Mr. Branor and Tom Malin"; and the coroner was notified about nine

o'clock and arrived about eleven o'clock, Roy Terry says he heard the shots and heard the Racines on their party telephone line call the doctor about seven o'clock, or about a half an hour or may be not quite so long after he heard the shots. Tom Malin says it was about an hour after he heard the shots before he arrived at the Racine home and that he stayed until after the inquest was held. Fred Racine says that right away after the shooting he telephoned to Dr. Barr and to the neighbors, which statement he qualified by saying it was probably between a half an hour and hour after the shooting that he telephoned these parties.

It was shown that defendant, just before leaving the Racines, had two blue and four yellow loaded shells, the latter containing No. 5 shot, and that when arrested he had in his pocket one blue shell and in the gun one blue and one yellow shell. He accounts for the three missing yellow shells by the claim that his wife fired two of them in the Racines' yard just before he left, in which he is contradicted by both of the Racines and several other witnesses, and by the shot that wounded him. The Commonwealth accounts for them by the two shots fired simultaneously at Mrs. Barnes and the shot that wounded the defendant. Fred Racine said the shot that killed Mrs. Barnes looked like No. 6 or No. 7.

Proof was introduced by defendant of the weights of No. 5 and other sized shot and of tests made by shooting No. 5 shot from defendant's gun through a fly screen but not through glass as the shots were fired that killed Mrs. Barnes, nor at the same angle, in an effort to prove that the shots that killed Mrs. Barnes could not have been fired by defendant.

We have given this rather lengthy *resume* of the evidence on both sides, about the competency of which no question was made, in order to show, as we think it does most conclusively, that the court upon neither the evidence of the Commonwealth nor upon all of the evidence erred in refusing to take the case from the jury. The evidence of defendant's guilt is circumstantial and upon some questions conflicting, but it is certainly such evidence as demanded a submission to the jury. Johnson v. Commonwealth, 179 Ky. 40; Johnson v. Commonwealth, 170 Ky. 766; and will sustain the verdict. Okerman v. Commonwealth, 176 Ky. 753; Little v. Commonwealth, 177 Ky. 24; Martin v. Commonwealth, 178 Ky. 439.

2.  Complaint is made of the evidence of John Conyers, a policeman of the city of Owensboro, who testified that, on August 24, 1916, at or about the time defendant and his wife separated, he arrested defendant for whipping his wife, to the admission of which defendant objected and moved the court to exclude it from the jury, which the court declined to do, and defendant saved an exception.  Without further objection from the defendant, the witness gave, in substance, the following testimony as to what occurred when the arrest was made: "He was complaining something about her not staying at home.  It seemed like that that was the trouble between them, that she did not stay at home like he thought she ought to."  "When I arrested him on that day, judge, he told me that he was going to treat her worse than that if she didn't discontinue the way she was doing. I found her out there, and as I approached the house he seen me and run out the back way and when I got in the house the furniture some of it was broken up and I think there was one looking-glass broken and some pictures and standtable, and she had her shirtwaist torn and she had red places on her throat where she said he had choked her." (The Court) "Do not state what she said."    (The witness) "He ran about six squares I think.  I found a big knife in his pocket open.  I brought him on to police headquarters.  I says 'Bill, what do you mean by this way of doing?'  I said 'That is awful to treat your wife that way,' and I think about the substance of his remark was that 'she don't treat me right' and says 'If she don't stop what she is doing I am going to treat her worse than that.' "

Defendant moved to exclude from the consideration by the jury all of the evidence of this witness, which motion was overruled, and the defendant excepted.  This evidence, we think, was clearly competent upon the question of motive to show the feeling of defendant toward his wife.  In Childers v. Commonwealth, 161 Ky. 440, this court said:

"It is the uniform rule in homicide cases to permit the Commonwealth to give evidence of any pertinent facts or circumstances tending to show ill-will or bad feeling on the part of the accused toward the deceased or a motive that may contribute to influence the commission of the act."    See also Day v. Commonwealth, 173 Ky. 269.

Complaint is also made that the court refused to permit Charles Dorn to testify that he knew Mrs. Racine and Nellie Blanford, and that he had seen the former drive into an alleyway and go into the place of the latter, who was proved to be a woman of immoral character. If the purpose of this testimony was to impeach the character of Mrs. Racine, a witness for the Commonwealth, it was clearly imadmissible, because evidence of particular acts is not admissible for that purpose. It was likewise inadmissible if, as stated by counsel for defendant in brief, it was offered for the sole purpose of contradicting Mrs. Racine, who admitted that she delivered butter and milk at the place of Nellie Blanford but denied that she had ever approached the house from the alley. Whether or not she had, in fact, upon one occasion gone to the house through the alley was wholly immaterial, and evidence to contradict her on that point was irrelevant and incompetent.

Defendant also complains that he was not permitted to prove by Lou Argust, a clerk in the store of S. W. Anderson & Co., that she called Mrs. Barnes on the telephone at Mrs. Racine's home a short time before she heard of the murder, but whether the day before or not she could not state, and had a conversation with Mrs. Barnes about coming to the store for a certain coat suit at a certan time. We are unable to see the relevancy of this evidence, as it could neither contradict Mrs. Racine, who denied that Mrs. Barnes had called up Lou Argust, nor corroborate the defendant, who testified that on the day of the murder, in the presence of Mrs. Racine and himself, his wife called up Lou Argust and told her she would come for a certain coat suit the next day, as the witness stated that, at the time she had the conversation with Mrs. Barnes, she called up Mrs. Barnes, not that Mrs. Barnes called her.

It is also insisted that the court erred in excluding the evidence of Ada Lyons, sister of defendant, that, in the month of October while Mrs. Barnes was at the home of Mr. and Mrs. Racine, the witness was there on a visit; and while there Mrs. Racine was in the habit of drinking and was frequently intoxicated and in that condition was quarrelsome, and upon one occasion Mr. and Mrs. Racine had a quarrel because he did not want her to go to a pie supper in her then state of intoxication. This evi-

dence was clearly inadmissible for the same reasons that the testimony of Charles Dorn was inadmissible.

3. The third ground relied upon for reversal is that the court failed to instruct the jury upon the whole law of the case, although it is stated by counsel for defendant, in brief, "we are not prepared to point out to the court any error in the instructions given, nor are we certain of our position relative to the giving of any further instructions by the court to the jury." The court gave instructions, correct in form, upon murder, reasonable doubt, and defining the technical terms used. There was no evidence whatever upon which to have based another instruction. The defendant was guilty of murder, or nothing; and it has frequently been held by this court that the instructions should submit the issues only to the jury, and it is neither necessary nor proper to give an instruction unless there is some evidence upon which to base it. Curtis v. Commonwealth, 169 Ky. 727; Day v. Commonwealth, 173 Ky. 269; Johnson v. Commonwealth, 179 Ky. 40.

4. After the jury had been sworn and when the court had adjourned for noon upon the first day of the trial, the sheriff started with the jury in charge to a hotel, some squares distant, for dinner, and one of the jury who weighed about 340 pounds said he was not well and did not feel able to walk to the hotel. Another juror, who had an automobile standing near the court house, offered to take him in the automobile if the sheriff would permit him. The sheriff gave his permission and, with the rest of the jurors, proceeded to the hotel on foot while these two jurors went in the automobile, one being upon the front and the other upon the rear seat. The two jurors were out of sight and hearing of the sheriff and the rest of the jury for but a very short time, as they overtook the sheriff and those jurors on foot and drove along within thirty feet of them in their sight to the hotel where they all joined again. Mr. R. P. Robertson, an attorney of the Owensboro bar, noticed this separation and, when court convened after noon, reported the fact to defendant's chief counsel. The fact does not seem to have been called to the court's attention by the attorney for the defendant or by any one until after the verdict, when it was presented in a motion and grounds for a new trial.

While we fully appreciate and approve the rigidity of the rule against permitting a separation of the jury

in a case where capital punishment may be inflicted, we do not think this separation furnishes, under the circumstances, grounds for a reversal. Whenever there has been a separation of the jury, it devolves upon the Commonwealth to show that such separation gave no opportunity for the exercise of improper influence upon members of the jury. Campbell v. Commonwealth, 162 Ky. 106. In this case, the Commonwealth filed the affidavit of the two jurymen and of the sheriff showing that the separated jurors were out of the presence of the sheriff and the rest of the jury for a few minutes only and during that time did not engage in conversation with any outsiders and did not themselves discuss or refer to the trial in any way; and this evidence is wholly uncontradicted. The separation was, therefore, not prejudicial to the substantial rights of the defendant. Deacon v. Commonwealth, 162 Ky. 188; Johnson v. Commonwealth, 179 Ky. 40. Again, as said in Heck v. Commonwealth, 163 Ky. 518:

"It has been held by this court that the accused may waive his right to object to permitting the jury to separate." In Black v. Commonwealth, 154 Ky. 144, it was said:

"When a new trial is asked on the ground that the jurors have been guilty of misconduct, the person seeking a new trial on this ground should do so at the earliest moment after he has received information of the misconduct complained of and should file his affidavit stating where he obtained the information. If the party seeking a new trial on this ground fails to do this he will be deemed to have waived his right to rely on the misconduct as a ground for a new trial after there has been a verdict against him." In Drake v. Drake, 107 Ky. 32, a civil case, but the rule is nevertheless applicable, it was said:

"A party should not, with knowledge of misconduct on the part of the jury, conceal it from the court and take a chance on a verdict in his favor with the expectation of having it set aside if adverse to him."

Counsel for defendant do not question the rule, but seek to avoid its enforcement here upon the ground that knowledge of the separation was imparted, before the verdict, to one of the attorneys for the defendant, and not to the defendant himself, who is not to be charged with the knowledge of his attorney which is not shown to have been possessed by him.

This contention, however, can not be sustained. The general rule is, that notice to an attorney is notice to the client employing him and that knowledge of an attorney is knowledge of the client. 6 C. J., p. 638; 2 R. C. L., p. 962. All of the authorities cited in both of these treatises in support of this rule are civil cases, but we are unable to conceive of any reason why it should not apply as well and as fully in criminal prosecutions, and we have found no authority making any such distinction. However that may be, we are quite sure that the facts here present no reason for an exception to the general rule. Counsel for the accused was in possession of information of conduct upon the part of some of the jury which, in the discharge of his duties in the management of his client's defense, he should have imparted not only to his client but to the court as well and before verdict, and it must be presumed that he performed his duty and imparted the knowledge to his client. In 12 Cyc. 735, in reference to a new trial in a criminal case upon newly discovered evidence it is said:

"Evidence is not newly discovered which defendant knew, but did not mention to his counsel, or which was known to his counsel and not communicated to defendant."

And the same rule unquestionably would apply to knowledge of a separation of the jury as to newly discovered evidence, upon a motion for a new trial.

5. The last ground urged for a reversal is alleged newly discovered evidence. Section 271, Criminal Code, provides:

"The court in which a trial is had upon an issue of fact may grant a new trial, if a verdict be rendered against the defendant by which his substantial rights have been prejudiced, upon his motion, in the following cases:

. . . .

"6. If the defendant have discovered important evidence in his favor since the verdict."

The criminal code does not prescribe the practice on applications for a new trial, other than to prescribe the time in which the motion must be filed, and in section 274 that, "The grounds upon which a motion for a new trial is made must be stated in writing, and filed at the time of making the motion." Where application for a new trial is made upon the ground of newly discovered evidence, the practice is the same in criminal as in civil

cases. Hays v. Commonwealth, 140 Ky. 184; Ellis v. Commonwealth, 146 Ky. 715. Section 343, Civil Code, provides that a motion for a new trial upon the ground of newly discovered evidence ''must be sustained by affidavits showing their truth; and may be controverted by affidavits.'' This has been construed by this court in criminal, as well as in civil, cases to require that defendant file his own affidavit setting out the material facts that he can prove by the newly discovered witness and that he did not know and, by the exercise of, reasonable diligence, could not have known of the existence of the newly discovered evidence until after the trial had concluded. Brown v. Green, 2 Duvall 234; Ellis v. Commonwealth, 146 Ky. 715. And in support of his affidavit, the defendant must satisfy the court by the affidavit or testimony of the newly discovered witnesses that they will so testify. In enforcing the rule as to supporting affidavits, this court in Bowling v. Commonwealth, 148 Ky. 9, said:

''But he did not support his affidavit by their *affidavit* that they would so state or by the *testimony* of any other person. This should have been done; for, were the rule otherwise, there would be no certainty that anything would be gained by granting a new trial.''

The rule as to supporting affidavits or evidence is not an express provision of any statute, but was adopted by this court as a necessary means of preventing a new trial upon the affidavit of the defendant alone as to what the newly discovered witnesses would testify; and the meaning and purpose of both the statute and the rule is to prevent new trials except in meritorious cases. Whether or not a new trial shall be granted is always within the sound judicial discretion of the trial judge, and the legislature necessarily left the question of practice largely to be regulated by the courts; prescribing only that unless the motion was in writing, filed in a certain time and supported by affidavits it must not be granted. These provisions are jurisdictional only and clearly not intended to hinder the court from making a full and satisfactory examination of the newly discovered evidence, before exercising the sound judicial discretion he is required to exercise. While it has been the usual but not the uniform practice for trial courts, in the examination of the materiality of newly discovered evidence and of the probability that defendant can produce such evidence upon another trial, to limit the parties to proof upon affidavits, there is nothing in

any provision of the code or of any rule approved by this court, which would preclude the trial court, after the defendant has filed a proper affidavit, from setting a day for hearing and subpoenaing the new witnesses to appear upon that day to be examined by the attorney for the defendant and cross-examined by the attorney for the Commonwealth; and such a practice unquestionably would enable the court much more intelligently and accurately to decide the questions to be determined, viz.: The materiality of newly discovered evidence, and whether, as a matter of fact, the defendant could prove by the new witnesses the facts, to which in his affidavit he has sworn they will testify. Unless he can prove such facts the new trial ought not to be granted, and the best test of whether or not he can do so is unquestionably an examination of these witnesses before the court.

This case presents a splendid illustration of the value and, in fact, the necessity of requiring the attendance for examination and cross-examination of the newly discovered witnesses, if the court is to reach an accurate and intelligent conclusion as to the necessity for a new trial, and such a practice is most certainly not an abuse of his discretion. In the affidavit filed by defendant, he swore that the witnesses would testify to facts which, if true, would have been material and, if due diligence had been shown, to have denied him the opportunity to present such evidence would have been prejudicial to his substantial rights. Yet, these witnesses, when examined in open court, refused to testify to any of the material facts to which defendant in his affidavit stated they would testify; and their testimony is wholly immaterial and affords no reason whatever for granting the defendant a new trial. We, therefore, approve of the practice whenever practicable of the trial court setting a day and requiring the attendance of the newly discovered witnesses for examination upon the trial of the question of granting a new trial upon the ground of newly discovered evidence, or alleged misconduct of the jury whether upon motion of the defendant, as here, or upon motion of the other party to the litigation, which evidence should of course be preserved and made part of the record, so that it may be considered upon appeal.

Perceiving no prejudicial error to defendant's substantial rights, the judgment is affirmed.