# Shorter v. Commonwealth.

(Decided March 7, 1933.)

J. O. BAKER, E. H. JOHNSON, R. L. POPE and J. D. POPE for appellant.

BAILEY P. WOOTTON, Attorney General, H. HAMILTON RICE, Assistant Attorney General, and J. S. FORESTER and ZEB STEWART for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER —Affirming.

The appellant, Katherine Shorter, has been sentenced to the penitentiary for twenty-one years for killing her husband. The claim of the defendant that the deceased had been associating with lewd women and for some time had been very cruel to her is sustained by the evidence. She had spent most of the time for three years and more in Lexington for the purpose of caring for her younger son, who was in college there. Another son also lived there. Every two or three weeks she would return to her home in Harlan, and she and the student son would spend vacation periods there. The arrangement was agreeable to the husband, who supported his wife and son. Mrs. Shorter concluded in February, preceding the killing in May, that she would remain with her husband, and went home to stay. It appears that he did not want her there, and tried to make her leave as she was interfering with his adulterous living. There is no denial of the defendant's evidence that time and again he cursed and struck her and threatened to kill her.

On a Sunday in May, 1932, Mrs. Shorter left Harlan about noon for Lexington. On the train she concluded she would need her coat, and at Pineville took another train back to Harlan, where she arrived late in the afternoon. Efforts to locate her husband when she did not find him at home were unavailing. She was working in the garden when he came home about 7 o'clock the next morning. It is pretty well shown that he had spent the night with some lewd women and was drinking. She went into the house a few moments after he arrived, and some of the neighbors testified to hearing an argument between them, followed by the shooting. One testified that she heard him say, "Please don't kill me." Another that he called her a vile name and then after the shooting started he said, "Oh, Kitty, you have done killed me;" and she said, "Shut up, Shorter, you made me do it." Another witness stated that she said, "You made me do it, you drove me to it." Another testified that a second or so after the firing ceased she said two or three times, "You are choking me." The accused left the house and surrendered to a deputy sheriff, telling him she had killed her husband. She also said at the jail, "The Lord only knows why I killed him; you could not make anybody believe I done that;" and later in the day she said she did not know

why she had put it off these many years. The older son, William, testified that she and his father "never did get along so good;" that she was "all the time after him;" that in Lexington two or three weeks before his father was killed she said that, "If he don't do better she would have to kill him." He also testified that the afternoon of the killing he asked her if his father saw her with the gun, and she said, "She didn't think he ever saw the gun before she started shooting;" and "I said, 'You had it behind you, didn't you?'" and she said, "Yes, she did." The deceased was shot five or six times in the right side and back of his head and somewhere about the shoulders. Bullet holes in the wall of the room were scattered about, but in the same general direction.

The defendant's evidence is that when she went into the house and asked if he wanted some breakfast, he told her he did not, and when she asked where he had spent the night he violently cursed her, but did say that he was at the pumphouse most of the night. He abused her for not having gone on to Lexington, and told her she would have to go there and stay, and when she replied that she would not stay, he struck her a time or two and knocked her across the end of the davenport and kicked her. She then got around him and reached her hand under the mattress of the bed to get hold of his pistol to hide it, believing that in his drunken, raving condition he would shoot her. She got the weapon, and, as she was passing him to go in the next room, he said, " 'Are you going?' and I said, 'No;' and he struck me again and grabbed me by the throat with his left hand and choked me and said, 'I will have to kill you now and be done with you,'" and continued to curse her viciously. She then raised the pistol and fired because she was trying to save her life and did not know anything else to do. He was a large, strong man. She did not remember anything after the first shot. It seems that the pistol was automatic so that it continued in action by simply holding the trigger. The defendant is corroborated in her statements as to what occurred by two absent witnesses, whose evidence was produced by affidavit as to what they would testify; that is, to the effect that during the time of the shooting they heard her cry out, "Will, quit choking me." A doctor who examined her several days after the homicide found several contusions upon her body. Con-

tradicting his older brother, Noel Shorter, who saw more of his parents, testified to a series of incidents of cruelty and threats by his father to kill his mother, especially when he was drunk. A neighbor testified that a week before the tragedy Shorter cursed his wife and said the only way he could be rid of her was to shoot her brains out.

There was no actual eyewitness to the tragedy, except the defendant, and her story as to the immediate occurrence in its essentials stands uncontradicted. And, while the impression is left that it was probably a justifiable homicide on the ground of self-defense, the verdict cannot be regarded as flagrantly against the evidence, for the jury had the right to reject the defendant's claim and accept the circumstances showing manslaughter.

Numerous additional grounds are submitted for a reversal. The older son appears at first to have been sympathetic with his mother, but suddenly turned against her and became unnaturally antagonistic, even to the extent of betraying the confidence his mother reposed in him on the afternoon of the tragedy. He admitted having employed counsel to assist in her prosecution. The younger son, as indicated above, stood loyally by his mother. Objection is taken to that part of William's evidence in which he asked his mother if she had the pistol behind her so his father did not see it, and she answered affirmatively. That was clearly competent. It was not materially different from what the defendant testified. Objection is also made to the rejection of some evidence tending to show that the reason for the older son's hostility was that one of his father's insurance policies called for double indemnity if he was not the aggressor when killed, and that he had been given to understand, if his mother should be convicted, she would not be entitled to any part of the proceeds. The court refused to permit Mrs. Shorter to testify that the son had brought suit against her and the insurance company to collect the insurance. That was proper, for the best evidence was the record. He also refused to permit her to testify about the son cursing and violently abusing her after she had been released from jail on bond. If it be conceded that this evidence was material and competent, its rejection cannot be regarded as prejudicial, for there was abundant

evidence of the son's hostility. The jury received full knowledge of the situation. We doubt if it attached any weight to his testimony. His appearance against his mother was calculated rather to have the opposite effect.

The trial court was very liberal with the accused in permitting proof as to the lewd associations and drinking of her husband, and the rejection of certain testimony along that line, about which complaint is made, was proper.

The statements of the accused to the officers were not only admissible, but harmless. The appellant concedes the inapplicability of the antisweating statute (Ky. Stats., sec. 1649b-1 et seq.) to voluntary statements, but argues that the burden is upon the commonwealth to show first that statements of an accused under arrest were not within the prohibited class. Assuming that to be correct, we may say the record demonstrates conclusively that the statements made by the defendant were not in any way under the ban.

Exception was taken to evidence of an undertaker as to the wounds on the body of deceased, because he was not qualified to testify as to the points of entrance and exit. There was really no controversy about the location of the wounds, and the same evidence was given by a doctor whose qualifications are not questioned. Sometimes the points of entrance and exit of wounds are difficult to determine, but ordinarily they are matters of mere observation. It would be better for the witness to describe the conditions, but where he confines himself to general statements of entrance and exit and is subjected to cross-examination, it is a matter of the weight to be given the evidence rather than a question of admissibility. Compare Bailey v. Commonwealth, 193 Ky. 687, 237 S. W. 415.

It is argued that the court should not have required the defendant on cross-examination to tell that the title to property which she and her husband had accumulated was in her name. She explained that some of this property was her own individual estate, with the acquisition of which the husband had had little or nothing to do. All of this was competent as tending to negative a reason of his wanting to be rid of her as she claimed.

There were a number of other items of evidence omitted and admitted about which complaint is registered. The court has given full consideration to every one of them, and finds that the objections are without merit.

In support of her motion for a continuance, the defendant filed an affidavit as to what three absent witnesses would testify if present. The court said to the jury that, if the named witnesses "were present in court and sworn and testifying before you," they would testify as was stated in the affidavit, which he then read. The court concluded with this admonition: "Consider that as testimony of the three witnesses whose names I called." The defendant thereupon moved the court to instruct the jury to give to the evidence of the three witnesses the same force and effect as if they were present in person and testifying before them. That is the substance of a statement in M., H. & E. Railway Company v. Allen, 152 Ky. 706, 711, 154 S. W. 5, 7, upon which authority the appellant relies. The statement in the opinion was what this court said the trial court should have made in response to objections to the argument of opposing counsel in which he referred to the testimony as being only the affidavit of counsel. However, the judgment was reversed upon another ground. The admonition of the court here seems to have been sufficient, although, as is shown in several opinions, the form suggested by the appellant is the usual one and perhaps it is also the better one.

The general reputation of certain of defendant's witnesses, who testified to the associations and whereabouts of the deceased the night preceding the homicide, was shown to be bad. It is said the court erred prejudicially in not admonishing the jury as to the effect and purpose of the impeaching evidence. It is the general rule with respect to evidence affecting the character of the defendant in his capacity as a witness that the court should admonish the jury of its purpose and particularly that it is not to be regarded as substantive evidence. As to a mere witness, the court may on its own motion, and should, if requested, give the usual admonition of the purpose for which impeaching evidence is allowed. Lay v. Commonwealth, 186 Ky. 163, 216 S. W. 123. But even when the witness is a defendant it is not a reversible error to omit the ad-

monition when no request was made to do so or the attention of the court to the omission was not drawn, except in extraordinary cases when the peculiar facts show it to have been prejudicial. Shell v. Commonwealth, 245 Ky. 223, 53 S. W. (2d) 524, and the cases cited. It certainly cannot be regarded in that light when the impeachment is of a witness who is not a defendant. Here there was no request made for such an admonition, and it must be regarded as having been waived by the defendant. Keller v. Commonwealth, 230 Ky. 815, 20 S. W. (2d) 998.

The defense asked for one and one-half hours for argument. The court granted one hour and then extended it to seventy-two minutes. That was wholly insufficient, argues counsel. A reasonable time should always be granted for the argument of a case, and what constitutes that, of course, depends upon the circumstances and facts of each case. The limitation on the time is within the discretion of the trial judge, and his action is to be regarded as error only when there appears to have been an abuse of that discretion. Thomas v. Commonwealth, 175 Ky. 38, 193 S. W. 653; Sizemore v. Commonwealth, 240 Ky. 279, 42 S. W. (2d) 328. Though it appears that parts of two days were consumed in the trial of this case and there were a number of witnesses introduced, the record is not voluminous. Much of the evidence related to collateral things, such as the general conduct and life of the deceased, and on the essential matters there were but few witnesses, and their testimony was not extensive nor the facts complicated. The time allowed appears to have been ample.

The point urged with the greatest emphasis is that the defendant was entitled to have the verdict set aside because of the separation of the jury. In support of her motion for a new trial, affidavits were filed to the effect that, at the hotel where they were taken for their meals, several members of the jury were permitted to enter the washroom and toilet without an officer, while the others remained in the hallway; that a man with a straw hat, who was not a member of the jury, talked to them, and that one of the jurors was seen talking over the telephone. Other affidavits stated that the members of the jury, after submission of the case, commingled with the jury in another murder case, and they

talked to one another. Upon this motion the court heard oral testimony. The deputy sheriff, who was in charge, and eleven members of the jury, testified that the deputy sheriff was the man with the straw hat who talked to them; that the officer examined the washroom before any of the jury was permitted to enter and saw there was no one in there; that, though the door to the hallway was closed, the officer remained by it with other members of the jury and no one had an opportunity to talk with them. One member talked to his wife over the telephone about his coat. One morning the two juries were in the hotel at the same time, but there was no association or communication between them other than the formal "good mornings" by one group to the other. It was developed upon the hearing that in walking between the courthouse and the hotel, although the jurors said the officer was strict with them and kept them close together, they were so strung out as to cover a space of forty to fifty feet. Another said they were as close together as was convenient, and did not cover more than twenty-five or thirty feet of space. It was also shown, that, when the jury was in the sheriff's room, one of the members at a time would step into the adjoining toilet. All of the evidence is that no one approached or talked to the jury, and that it was closely kept together. It was testified that there was a door from the hotel washroom opening into an alley, but it is not disclosed that this door was ever open. The trial court found that there was in fact no separation of the jury, or at least none that would violate the rule requiring the members to be kept together. The inviolability of a jury in a murder case is so highly regarded that it has become a well-settled rule that "in all cases of separation [it must] be shown clearly by the state that no opportunity has been afforded for the exercise of improper influences on the juror." Campbell v. Commonwealth, 162 Ky. 106, 172 S. W. 110, 112; Summers v. Commonwealth, 236 Ky. 499, 33 S. W. (2d) 594. We are cited to several cases in which it was held that the defendant was entitled to a new trial because of a violation of this rule. But a consideration of the facts of each easily distinguishes them from this case. Some of our opinions which sustain the rule of the trial court are Carter v. Commonwealth, 176 Ky. 360, 195 S. W. 825; Fugate v. Commonwealth, 187 Ky. 564, 219 S. W. 1069; Johnson v. Commonwealth, 179 Ky. 40, 200

S. W. 35; Barnes v. Commonwealth, 179 Ky. 725, 201 S. W. 318; Adkins v. Commonwealth, 197 Ky. 385, 247 S. W. 26; Clemens v. Commonwealth, 224 Ky. 370, 6 S. W. (2d) 483; Wilson v. Commonwealth, 243 Ky. 333, 48 S. W. (2d) 3. This ground cannot be sustained.

In support of the ground of newly discovered evidence submitted in her motion for a new trial, the defendant showed she could prove by a named person certain adulterous conduct of the deceased in his own home during his wife's absence, and elsewhere. Conceding this was of a cumulative character, the argument is made that it was not actually cumulative, since the reputation of the defense witnesses (three women) was attacked and another was shown to have taken an active, friendly interest in behalf of the accused, and thereby his evidence was weakened. As stated, the trial court was very liberal in letting in this sort of evidence, and we cannot hold it was error to refuse a new trial on this ground.

Finally, it is submitted that it was error not to define the term "sudden affray" in the instructions. It is argued that while perhaps this alone would not authorize a reversal of the judgment, coupled as it is with other errors, it does justify that action. The court has several times written that this term should be defined, but failure to do so is a harmless error. Gillis v. Commonwealth, 202 Ky. 821, 261 S. W. 591; Wallace v. Commonwealth, 207 Ky. 122, 268 S. W. 809; Fletcher v. Commonwealth, 210 Ky. 71, 275 S. W. 22. The omission here must be so regarded.

We have given very careful consideration to the many arguments in behalf of this unfortunate woman. It is insisted that she has been the object of active hostility on the part of the railroad men with whom her husband worked and some of the sheriff's force as well. That does not appear in the record. Although the verdict seems severe, under all the circumstances it was a matter for the jury. She has been ably defended, and in our opinion had a fair trial. We are therefore constrained to affirm the judgment.

Judgment affirmed.