## Adkins v. Commonwealth.

(Decided January 23, 1923.)

### Appeal from Knox Circuit Court.

1. Criminal Law—Instructions on Murder, Self-defense and Accidental Shooting—Evidence.—Facts examined, and held that in this case: (a) An instruction on murder was proper, (b) the verdict was sustained by the evidence, (c) the instruction on self-defense was proper, and (d) an instruction on accidental shooting was not warranted by the evidence.

2. Criminal Law—Separation of Jury in Trial of a Homicide.— Temporary separation of jurors in the trial of a homicide is not reversible error, when it is established that this was of necessity and that no one communicated or attempted to communicate with them.

3. Criminal Law—Separation of Jury.—Not reversible error for jury to be quartered in two rooms, six in each, overnight, when it affirmatively appears that the outer doors were locked and the inner doors closed, and that the sheriff's bed was stationed so that no one could enter or leave their room without passing him, and it further appearing that there was no communication of any kind with them either had or attempted to be had.

H. H. OWENS, J. B. SNYDER, R. L. POPE and J. J. TYE for appellant.

CHAS. I. DAWSON, Attorney General, and THOS B. McGREGOR, Assistant Attorney General, for appellee.

Opinion of the Court by Judge McCandless—Affirming.

Appellant was tried in the Knox circuit court on an indictment charging him with the murder of Jerry Bowling. He was convicted and sentenced to the penitentiary for life, and to reverse that judgment prosecutes this appeal.

The homicide occurred at Haven, a stop on the Manchester & Cumberland Railroad, about 12:30 o'clock on Sunday in October, 1921, the defendant at the time killing two men, Jerry Bowling and Bob Blevins.

There is no ticket office at this place but a small shed takes the place of a depot. This lies to the east of the railroad, which at that point runs north and south. On the west side of the road and nearly opposite the station is a small store building, and just north of the rear end of the store is a yard and residence; both buildings at the time being the property of Bob Blevins. The front gate of this yard is about twenty steps from the rear of the store, and about seven steps from the door of the residence. A public road winds up the hill in front of the residence and by the store, crossing the railroad somewhere near the depot.

It appears that the defendant was a small farmer and laborer, then living about one mile from Haven. That he had theretofore worked for Bob Blevins and ran an account at his store, there not being the slightest evidence of any unfriendliness between the parties prior to the day of the homicide.

Blevins did a general mercantile business, seems to have been the owner of a small coal mine, and had recently been appointed deputy sheriff of Knox county. Further there is some evidence to the effect that he was engaged in the illicit liquor traffic.

Jerry Bowling was 62 years of age and resided with Bob Blevins. He appears to have been an inoffensive character, though there is some evidence that he, too, was dabbling with liquor.

On the morning of the homicide the defendant purchased a quart of liquor from Bob Blevins and met up with a number of his friends about one-half mile away, and engaged in a general treat, but it does not appear that he became intoxicated. While at this place and at the request of two friends, Victor Hammond and Charlie

White, he undertook to secure a quart of liquor for White, who was not on friendly terms with Blevins, and he and Hammond went to Haven for that purpose, Hammond stopping at the station and defendant going down to the house of Bob Blevins, hitching his mule at the gate.

After this, according to Hammond, the defendant reappeared in about fifteen minutes, coming out of the house and walking up the road with a pistol in his hand, cursing Bob Blevins and Jerry Bowling; saying that he was not afraid of every G— d— Bowling and Blevins of the name, and that they could not mistreat him. The witness, Hammond, quieted him and went down to the gate with him to get the mule. Upon arriving there defendant told Blevins to pay him a note he owed him.

Blevins came out with a pencil and a paper in his hand and said, "Joe, you have got the note, you bring it up and I will pay you off." An altercation then ensued between Blevins and the defendant, ending with the defendant calling Blevins a G— d— liar, and Blevins telling him that he was another.

Jerry Bowling at that time was standing in the yard listening but taking no part in the controversy, and Hammond took the defendant back up to the railroad, the defendant still repeating that he was not afraid of every G— d— Bowling and Blevins of the name. At that time Jerry Bowling came walking up the road in the direction of the station with his hands in his front pockets, and said, "Joe, what have you got against me? I have done nothing to you and have got nothing in the world against you." Then defendant fired his pistol and Jerry Bowling fell.

Steve Burnett, another eye-witness, said that the defendant came out of the house with a gun in his hand, repeating once or twice that he was not afraid of every G— d— Bowling and Blevins of the name. Immediately afterward Jerry Bowling came walking very slowly in the direction of the depot, with his hands in his front pockets. Joe Adkins said, "Jerry, don't you come this way any further; if you do I will kill you," and Jerry said, "Joe, we are friends, I don't want any trouble." Jerry kept coming on and Joe had his gun and dropped it down this way (indicating) and then Joe held it up in both hands and shot him down."

Taft Blevins in a general way corroborates the other witness, Victor Hammond, as to what was said at the

gate, and testifies that he and his father then went back to the house. That at the time the first shot fired his father was unarmed and entering the door of his resi- dence. Jerry Bowling called to him to come to him, that he was killed, and that his father grabbed his pistol and stood for a little while. "He just turned around and went on, started out to uncle Jerry, and he kept calling to him to come to him, and he started out there and got out- side the pailing; Joe Adkins shot at him and father shot back at him, and father ran on behind the storehouse, and Joe shot again and he shot at him, and then Joe killed him."

Willie Phillips testifies that about two hours before the killing the defendant borrowed from him a 45 Colt's pistol, saying that he wanted to kill some hogs. That about 45 minutes later he met him again and that he was crying, and tried to purchase the pistol from him, and after his refusing to sell it to him he pulled the gun part of the way out of his pocket, and said "that no G— d— man could get that gun back."

Willie Sprinkles testifies that the defendant tried to borrow a pistol from him on that morning. On the other hand the defendant denies these transactions with Sprin- kles and Phillips. He claims that he was at Blevins' home that morning and procured a quart of whiskey from him, and when he went again for whiskey for Char- lie White, as indicated above, that he informed Blevins that it was for Charlie White, and that Blevins became angry, and would not let him have it as he was afraid White would turn him up. That he then requested Blevins to pay him something on the $50.00 note which he owed him. That Blevins told him that if he was not satisfied with the security to take a 45 Colt's pistol which was lying on the dresser and hold it as additional security, and that he ordered him out of the house and told him not to come back again, that if he did "his hide would not hold shucks;" that as he picked up the pistol Blevins shoved him out the door.

That he then went up to where Hammond was and came back to get his mule to go home. When he got to the gate Bob and Jerry came out and told him to stop; that Bob told him to bring the note up on Saturday and he would try to pay it. This resulted in a quarrel in which Bob called him a G— d— liar, and he passed it back. That Victor Hammond had the mule unhitched and he walked away up the road.

He describes the shooting of Bowling thus: "I saw Bowling come walking up the road. He had his hands in his pockets and I saw Bob Blevins standing about two steps inside the gate with a bright pistol in his hand, and he stepped another step or two toward the gate, and I said, 'Don't come here on me, Jerry,' and Jerry said, 'Come on, Bob,' and Bob went to throw his pistol up and I throwed mine on Bob and we both fired; Jerry Bowling fell.

"He never had anything but the kindliest of feelings for Bowling, and had no desire to hurt him, but that he came in the line between him and Bob as he shot; that he had been preparing to go home and had his pistol at his side when Blevins appeared; that after Bowling fell Blevins jumped three or four steps toward the storehouse and fired again at him and he fired the second time at Blevins; that Blevins fired the third shot, and he responded and Blevins fell; that Blevins was thirty steps away at the first shot and had advanced to within twelve steps of him at the time of the third shot; that he had no pistol of his own, and did the shooting with the pistol that Blevins had given him that morning."

Ace Hatfield and Alonzo Adkins were eye-witnesses and their testimony corroborates his evidence as to the encounter. Other witnesses testify that before starting to Haven he raised his coat and showed them he had no pistol, and that he did not have any at that time.

From these premises counsel argue that no malice existed and that it was erroneous to submit a murder instruction to the jury, and that for the same reason the verdict is excessive and should be set aside.

It is further urged that the court should have given an independent instruction on accidental shooting, and that it was erroneous for the court to instruct the jury on the law of self-defense as against Jerry Bowling.

Counsel seems to overlook the testimony of the Commonwealth's witnesses as to the defendant's conduct and language toward Jerry Bowling immediately before the shooting. Such testimony was sufficient proof of malice to submit the question to the jury. It was the province of the jury to pass upon the credibility of the witnesses and to determine which set they would believe, and in their acceptance of the Commonwealth's testimony this court cannot say that the verdict is palpably and flagrantly against the evidence.

On the question of self-defense the court instructed the jury:

"Although you may believe from the evidence beyond a reasonable doubt, that the defendant, Joe Adkins, in Knox county, and before the finding of the indictment shot with a pistol loaded with powder, leaden balls and other hard and explosive substances, the deceased, Jerry Bowling, from which shooting and wounding said Bowling did within a year and a day die, yet if you further believe from the evidence that at the time he did so shoot, wound and kill Bowling, he, the defendant Adkins, believed and had reasonable grounds to believe that he was then and there in immediate danger of death or the infliction of some great bodily harm at the hands of Jerry Bowling or Bob Blevins, or either or both of them, and it was necessary or believed by the defendant, Adkins, in the exercise of a reasonable judgment, to be necessary to shoot and wound or kill the said Blevins or said Bowling, or either or both of them to avert that danger, real or to the defendant reasonably apparent, then you ought to acquit the defendant on the ground of self-defense or apparent necessity therefor.

"Or, if you believe from the evidence in this case that at the time the defendant Adkins shot, wounded and killed the deceased Bowling, if he did so, he, the defendant, Adkins, believed and had reasonable grounds to believe that he was then and there in immediate danger of death or the infliction of some great bodily harm at the hands of Robert Blevins, and that it was necessary or was believed by the defendant Adkins, in the exercise of a reasonable judgment to be necessary to shoot and wound or kill the said Belvins to avert that danger, real or to the defendant reasonably apparent, and that the defendant in shooting at Blevins, unintentionally shot, wounded and killed said Bowling, then you will acquit the defendant on the ground of self-defense and apparent necessity therefor."

Defendant's proof conduced to show that Jerry Bowling and Bob Blevins were both on the porch with their pistols in their hands just before the shooting, and that Jerry Bowling immediately thereafter walked up the road with his hands in his front pockets, following defendant, and Bob followed Jerry with a drawn pistol, which he pointed at defendant, and that defendant shot to save his life. While he claims Bob was an appreciable distance behind Jerry and that he shot at Bob with-

out intending to hit Jerry, who came in the line of the ball, still under such circumstances and in view of the evidence that he had just been cursing them both, the natural presumption would be that he was menaced by both, hence the self-defense instruction given as to Jerry Bowling was not prejudicial, but it might have been error not to have given it.

He does not claim that he shot accidentally or that there was an error in his marksmanship, but contends that he was shooting at Bob Blevins in an effort to save his own life. Under such circumstances his justification or culpability in shooting Jerry Bowling is measured by the same rule as it would have been if he had shot Bob instead of Jerry and was on trial for shooting Bob. The instructions quoted conform to these views.

During the trial the jury was boarded at the residence of the jailer. There was no room large enough for them and the sheriff to remain together, during the night, and he quartered them in two rooms, the jurors' rooms being so arranged as to require any one going in or out thereof to pass the bed in which he was sleeping. The outside doors were locked and the inside doors were closed and it appears that there was no communication between the jurors and any one else.

On the first day the table in the dining room was not of sufficient length to accommodate thirteen men, and the party ate in sections, no one else being at the table with them. While one division was eating the other remained on the porch alongside the dining room in partial view of each other, there being both a door and window connecting the two, but the sheriff being in a position to have control of the entire party at all times. Also the toilet was at the rear of the residence and it would be visited by a few of the jurors at a time, while the other members of the jury remained in the front yard, a distance of possibly twenty-five steps away. At such times the sheriff stationed himself between the two parties and in a position that he could see all that was going on, at least outside the toilet, and it does not appear that any one else visited the toilet while the jurors were therein.

It is further claimed that a brother of the deceased was at the jail and talked with the jurors, and that others did the same. The sheriff and ten of the jurors have filed affidavits covering all the matters above suggested. They deny this incident in toto, and aver that none of the jurors talked to Bowling or to any one, and that no one

approached them for that or any other purpose. In this they are also corroborated by the jailer.

This court has had occasion to consider a number of cases in which instances of this character have arisen.

In the case of Vinegar v. Commonwealth, 104 Ky. 106, the jury were separated without any order of court, half of the number in charge of one deputy, and the other half in the charge of another deputy, who took them to a drug store, livery stable and elsewhere. It further appears that the jurors were placed in different rooms in the hotel, the deputies sleeping in another room. It does not appear that any of the doors were locked, and this practice was condemned.

In the case of Thacker v. Commonwealth, 23 Law Reporter 745, eight of the jury went to a livery stable accompanied by the sheriff. The other four went to their hotel unattended, where after a time they were joined by the rest of the party. This judgment was set aside.

In Campbell v. Commonwealth, 162 Ky. 107, the sheriff left eleven of the jurors at the hotel unguarded and took the twelfth to a drug store some two or three hundred yards away and stayed with him long enough to eat a saucer of ice cream. It is further shown that as the jurors were being conducted to the boarding house on one occasion an unknown man joined one of the jurors who was lagging behind the others and walked with him some distance, the two appearing to be engaged in conversation. This case was reversed.

On the other hand, in the case of Minor v. Commonwealth, 5 Ky. Law Reporter 176, it was held that the lodging of the jury in the hotel on the second floor in different rooms along the same hall in which the sheriff joined them at night, there being no pretense that they were tampered with, was sufficient compliance with the requirements of the Code.

In Wynn v. Commonwealth, 188 Ky. 557, the sheriff took the jury to a skating rink, and one of the jurors went upon the stage with the musicians and took part in the playing. The sheriff and the other jurors were seated some thirty feet away. The judgment in this case was affirmed.

In Barnes v. Commonwealth, 179 Ky. 732, one of the jurors was too heavy and large to walk, and another juror drove him to the hotel in a machine, while the other ten walked to the hotel in charge of the sheriff. For a short time the two were out of sight of the other members

but overtook them and rode a short distance from them until they all reached the hotel.

In reference to this the court said:

"While we fully appreciate and approve the rigidity of the ancient rule against permitting a separation of the jury in a case where capital punishment may be inflicted, we do not think this separation furnished grounds for a reversal."

In Cox v. Commonwealth, 181 Ky. 434, the jurors were out walking on Sunday afternoon and stopped at a spring to get a drink. One of them, Rice, went in a nearby toilet. While there the sheriff and other jurors started back without noticing Rice's absence. On coming out Rice missed them and started up the street alone. He met an acquaintance and asked him in reference to the other jurors and was informed the direction they had taken, and pursued and overtook them. This case was affirmed.

In Blewett v. Commonwealth, 91 Ky. 200, two of the jurors after the submission of the case went in a different room of the courthouse and remained away from the other jurors thirty minutes. Judgment was affirmed.

As stated in French v. Commonwealth, *supra*:

"This safeguard of the ancient law, alike vitally important to the state and to the accused, must not be impaired or frittered away. In all cases of separation it must be clearly shown by the state that no opportunity has been afforded for the exercise of improper influences on the jurors."

This principle runs through all the decisions cited, and the burden is at all times on the Commonwealth to sustain it. But when as in this case the separation is one of necessity, or is temporary only and all the facts and circumstances indicate that no communication by outsiders was had with the jury and no opportunity afforded for them to be influenced in any way, the affidavits of the jurors are sufficient to overcome the burden and when such are filed all the cases hold that such separation will not affect the verdict, and in this way the various decisions quoted may be reconciled. See also 16 Corpus Juris, 1075.

Seeing no error in the record the judgment is affirmed.