## York v. Commonwealth.

(Decided December 21, 1923.)

Appeal from Clay Circuit Court.

1. Homicide—Evidence Sufficient to Sustain Conviction.—Evidence held sufficient to sustain a conviction for murder.

2. Criminal Law—Jury are Triers of Facts.—The jury are the triers of facts, and their verdict will not be disturbed unless apparently great injustice has been done the accused.

3. Criminal Law—Separation of Jury Held Not Prejudicial.—A separation of jury was not reversible error where it appeared that one was ill and unable to leave his bed and that the others were compelled to comply with a call of nature, and before leaving the sheriff exercised every possible care and diligence to prevent any communication whatever with the juror left behind, carefully locking the door, and being gone only about 10 minutes, and it being just daylight, when none of the inhabitants of the place were astir, and could not well have been aware of any separation under Criminal Code of Practice, sections 244, 246.

RAWLINGS & WRIGHT and LEWIS & LEWIS for appellant.

THOS. B. McGREGOR, Attorney General, and LILBURN PHELPS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE ROBINSON—Affirming.

On Christmas Eve, December 24, 1921, Clarke York, a son of appellant, Sol York, received a number of knife wounds at the store of Jess Maggard in Clay county, the cutting being done by Sam Hammond and Bert Cupp, two young men residing in that neighborhood; and on Christmas afternoon the appellant was in his home on Rockcastle creek, where his wife was confined on account of illness and his son, Clarke, from the wounds that he had received the night before. With him was a son, McKinley York, and two others, Bradley and Charlie York, had just left expressing their intention of visiting the store of Jess Maggard about half a mile distant. A few moments after their departure and while they were still in sight of the house, rifle shots were heard from a direction opposite the residence of appellant, and a number of bullets struck his home, but no one therein was injured. Appellant immediately ran outside, claiming to have seen some one shooting down near what they called the "pine thicket," which lay between his home and that of Tom Martin, a neighbor living near. After ascertaining the direction from which the shots had come appellant went to the store of Jess Maggard (for just what reason is not shown), but in any event, he failed to find his sons, who had returned to their home by another route. The father immediately came home, and it would seem that a general council was held between Sol York, Bradley, McKinley, and Charlie (his three sons); and they decided to go to the home of Tom Martin and examine his rifle in an effort to determine whether he or anyone there had done the shooting, and apparently to be prepared for any emergencies that might arise. Appellant carried two guns—one a rifle described as a "45-70" and a shot gun. Bradley had two pistols, Charlie a shot gun and McKinley two pistols described as a "38 special" and a "45 automatic." It is further shown by the evidence that prior to going to Martin's members of the family had visited the house of neighbors and secured an extra supply of ammunition for some of the weapons, and before approaching the house they separated, arriving there from different directions. Bradley and McKinley York entered the house and demanded that they be shown the rifle of one of the Martins, and after making an examination stated it was not the gun from which the shots had been fired at the house.

The appellant and his son, Charlie York, had remained on the outside, and seeing Hugh Hammond, a visiter there and the father of Sam Hammond who had cut Clarke York the evening previous, said to him, "Where are your boys?" and before Hammond replied the question was answered by Sam Hammond, who had just come into the yard with Bert Cupp. In appellant's testimony he states that Sam Hammond said, "By God, here we are;" and a general firing began. In Cupp's testimony he says that Hammoid simply said, "Here we are," and that the Yorks opened fire on the entire party, to which they replied as rapidly as possible, resulting in the instant killing of Bradley York and Hugh Hammond; and Sam Hammond was so badly shot that he died within two hours. McKinley York was shot through the knee and Sol York, the appellant, in the hip. A large number of witnesses testified both for appellant and the Commonwealth, and for the former it was stated that Sol York carried only one weapon, a shot gun, and did not participate in the shooting; while others testified directly to the contrary, and that he, with his three sons, started the affray and fired as long as their ammunition lasted. The testimony is also conflicting as to the presence of Goebel Hammond, another son of Hugh Hammond, it being stated by some witnesses that he was present during the shooting and by others that he arrived just as it ended. In any event, the appellant, Sol York, and his three sons were indicted for murder in the killing of Hugh and Sam Hammond, and Bert Cupp and Goebel Hammond for the shooting of the Yorks.

The indictment charging them with the murder of Hugh Hammond was returned at the April term of the Clay circuit court. There was also a second count in the indictment charging them with conspiracy to kill and murder Hugh Hammond and Sam Hammond, his son, and others.

It appears from the record that McKinley York was first tried and convicted, receiving a life term in the penitentiary. Appellant was tried at a special term of the Clay circuit court in December, 1922, and from the judgment of twenty-one years in the penitentiary this appeal is prosecuted.

Attorneys for him in their motion and grounds for a new trial cite the following:

"1.   The court erred in admitting incompetent evidence offered by the plaintiff to which defendant objected.

"2.   Because the court erred in rejecting competent evidence offered by the defendant.

"3.   Is substantially the same as the second.

"4.   Because the verdict of the jury is not sustained by sufficient evidence and is contrary to law.

"5.   Because of erroneous instructions.

"6.   Because the jurors were allowed to become separated during the progress of the trial."

But after a careful review of the case, we find that but one of the grounds is worthy of serious consideration.

Throughout the evidence there was undeniable proof that the four Yorks, appellant and his three sons, went to the home of Tom Martin where this shooting occurred prepared for any trouble that might arise, whether of their making or not. There seems to be no apparent reason for their arming themselves in the manner admitted if their mission was intended simply to discover who might have fired upon their home; and while such flagrant violation of the law and danger to their family was inexcusable, nevertheless, they state they entertained but a mere suspicion that these shots had come from the rifle of Tom Martin or any member of his family. And it seems highly probable and almost a certainty that in the council held in their home it was there determined to proceed to the Martins and wreak dire vengeance upon any possible excuse. It is not shown conclusively that they knew of the presence there of Hugh Hammond (father of Sam Hammond), who had cut their son and brother the night before, or of Sam Hammond himself or of Bert Cupp, another participant in that fight; but, nevertheless, armed as they were in absence of any possible excuse for such a formidable display of weapons, the natural conclusion seems, if not acting upon a predetermination to kill and slay, they viewed with utter and reckless disregard such possibilities, and invited trouble by their actions. As above stated the evidence is exceedingly conflicting, but the physical fact that three men were slaughtered within one minute's duration is ample and convincing proof that the guns of the York family wrought frightful havoc.

We can find nothing in the record disclosing that incompetent evidence was admitted, or competent evidence

refused; and in the fourth ground we are convinced that the verdict of the jury was sustained by abundant evidence and is not contrary to law. As before held by this court in numerous cases: "The jury are the triers of the facts, and their verdict will not be disturbed unless apparently a great injustice has been done the accused." And the evidence of guilt in this case is so conclusive that we feel constrained to say the verdict of twenty-one years at which the jury arrived was not accompanied by any evidence of passion or prejudice as complained of, and offered no grounds for a reversal, which is supported in the case of Tetterton v. Commonwealth, 89 S. W. 8, 28 Ky. L. Rep. 146, in which the court said:

"Considering all the facts and circumstances proven as to the conduct of the deceased at and prior to the time he was killed, as well as the conduct of appellant, we are of the opinion that he was guilty of the crime of manslaughter, but we think the penalty as fixed by the jury was rather severe. The jury, however, were the triers of the facts."

The judgment of the lower court was affirmed, notwithstanding it considered the verdict severe; and we cannot feel that the judgment herein complained of was in any degree harsh or oppressive, and are in fact of the opinion that great clemency and mercy were shown, attributable probably to the knowledge that appellant was a man of more than 60 years of age; and this belief is made tenable by the fact that his son, McKinley, charged with the same offense was given a life term in the penitentiary.

No. 5, complaining of the instructions offered by the court, need not be considered, as they appear ample and cover carefully every phase of the case.

The sixth ground upon which attorneys for appellant base their chief contention, "Because the jury were allowed to become separated after the trial had begun," is of a more serious nature, and had the circumstances been different, this court might have felt the appellant entitled to a reversal.

In the transcript appellant files an affidavit to the effect that the jury, while trying his case, were allowed to separate for about twenty or thirty minutes; that it was done without his knowledge or consent or without the consent of his attorneys or any order of the court; and he did not discover these facts until after the verdict had been rendered and the jury discharged. He is also

supported by an affidavit of the acting jailer of Clay county, Kentucky, Joe Lewis, who states substantially the same facts and to the effect that he saw the deputy sheriff who had charge of the jury with eleven members on the street in front of the courthouse, and one juror, John G. White, was not with them, he being left alone at the boarding house in their absence. In a counter-affidavit filed by sheriff Dave Smith, in whose care the jury had been placed during the trial, he says that he had read the affidavits of appellant and Lewis to the effect that eleven of the jury had been separated from the last juror, White, for a period covering twenty or thirty minutes. However, this is not true, and he further explains it as follows: That John White, a member of the jury, became very ill one evening during the trial and on the following morning, owing to this indisposition, was unable to leave the quarters they occupied, and at daylight a number of other jurors, forced to answer a call of nature, requested that they be permitted to do so. White claimed he was unable to leave his bed, stating it would make him ill, and as he could not be removed from the room the affiant locked him in carefully and took the other eleven out for the purpose mentioned, and they were not absent more then ten minutes. He further says that owing to the early hour there was no one stirring on the streets, and upon their return there was no evidence of anyone's having been near the room of juror White. He was further convinced that no one knew he was in the room during their absence; and that after the trial White informed him that he had hung the jury for a long time in its deliberations in an endeavor to secure for the appellant a lesser sentence.

In their contention for a reversal owing to the separation of the jury attorneys for appellant cite sections 244, 245 and 246 of the Criminal Code. In section 244 it is held:

"On the trial of offenses which are or may be punished capitally the jurors, after they are accepted, shall not be permitted to separate, but shall be kept together, in charge of the proper officers."

In section 245:

"When the jury is kept together in charge of officers, the officers must be sworn to keep the jurors together, and to suffer no person to speak to, or communicate with, them on any subject connected with the trial, and not to do so themselves."

Section 246 is the well known admonition of the court relative to their not being permitted to separate or speak to any one relative to the case or discuss the subject among themselves until its final submission.

They further cite the case of French v. Commonwealth, 100 Ky. 63. In this it is shown that while the accused was on trial for murder and after its submission to the jury, one of the members was allowed, under verbal consent of the trial judge and in company with the deputy sheriff, to go to his place of business some blocks away in the city of Louisville for the purpose of closing his house, while the other eleven were taken to their hotel, to which place in some twenty minutes the deputy sheriff and the juror returned, having gone in the meantime to the juror's residence and to the Pendennis Club. Upon ascertaining these facts and before a verdict was returned, a motion was made to discharge the jury, which was overruled, and a verdict of guilty returned, from which appellant appealed. In reviewing the case the court said:

"Manifestly the occasion here furnishes no cause for the separation within a fair construction of the law; and, if it did, it must yet, in all cases of separation, be shown clearly by the state that no opportunity has been afforded for the exercise of improper influences on the juror. The explanations offered here for traveling about the street are indefinite, if not evasive."

The judgment was reversed. However, it will be observed that the court, anticipating that occasions might arise where this necessity would be imperative, said:

In all cases of separation "it must be shown clearly by the state that no opportunity has been afforded for the exercise of improper influences on the juror."

The case of Heck v. Commonwealth, 163 Ky. 518, is further cited, wherein it appears that the court in impaneling the jury to try appellant under indictment for murder was unable to complete the panel on the first day of the trial, and when it adjourned, five jurors who had been accepted were permitted to separate and go to their homes. The panel was completed the next day and the trial proceeded. Just why this case should have been cited by appellant we are unable to determine; and while it was reversed the court distinctly held that, owing to the fact that these five jurors having been allowed to return to their homes and it being done in the presence of

the accused and his counsel without objection, it was not reversible error; and further stated that the accused may waive his right to object to permitting the jurors to separate and that an objection made to the separation of the jury for the first time in a motion for a new trial will not be considered; the objection should have been made at the time. Citing Wilkerson v. Commonwealth, 88 Ky. 29; Vinegar v. Commonwealth, 104 Ky. 106; and others, it further says:

"The separation complained of having taken place in the presence of the appellant and without objection from him, he could not thereafter complain of it; and not having presented it at any time to the court, it is presumed that he waived his right of objection on that account."

And while, as we have said, the judgment of the lower court was reversed, it was due to improper instructions. However, in the case with which we have to deal appellant could not have waived his rights to object to the separation of the jury, as, of course, he was not cognizant of that fact until after the verdict had been returned.

The case of Thacker v. Commonwealth is also cited in 23 Ky. L. Rep. 745. In this it appears that eight of the jury went to a livery stable accompanied by the sheriff, the other four going to the hotel unattended, and later were joined by the rest of the number. The judgment of the lower court was reversed. In fact a reversal is entirely proper where it is shown that a jury became separated from any cause and it is not demonstrated clearly that during such separation they were not or could not well have been approached or conversed with relative to the matter under trial. But, on the contrary, it is equally conclusive that a verdict should not be disturbed for mere technicalities or where it is clearly demonstrated that such separation was unavoidable and that it was not or could not have been attended with any results of a nature calculated to injure the rights of the accused. In support of this we find in Wynn v. Commonwealth, 188 Ky. 557, that the sheriff who had the jurors in charge accompanied them to a skating rink, whereupon one of them went upon the stage with the musicians and participated in the playing, the sheriff and other jurors being seated some thirty feet away. The judgment was affirmed. In Barnes v. Commonwealth, 179 Ky. 732, one of the jurors being too heavy and cor-

pulent to walk, another juror drove him to the hotel, in which they were staying, while the other ten walked there in charge of the sheriff. For a short time the two were out of sight of the other members, but overtook them and rode a short distance from them until they reached their destination. In referring to this instance, the court said:

"While we fully appreciate and approve the rigidity of the rule against permitting a separation of the jury in a case where capital punishment may be inflicted, we do not think this separation furnishes grounds for a reversal."

In Cox v. Commonwealth, 181 Ky. 434, the jurors accompanied by the sheriff were out walking one Sunday afternoon and stopped at a spring for a drink. One of them named Rice went into a nearby toilet, and while there the sheriff and other jurors, failing to note his absence, started back to their quarters. Upon coming out, Rice walked up the street alone and meeting an acquaintance asked him the whereabouts of the other jurors, and was told the direction they had taken. He then joined them. Judgment affirmed.

In Blyew v. Commonwealth, 91 Ky. 200, after the case had been submitted to the jury two of them went into another room of the court house and were absent from the jurors thirty minutes. The judgment was affirmed.

In 197 Ky. 393 appellant was on trial for murder, and during their deliberations the sheriff was unable to find quarters large enough for the jury to remain together at night, and he placed them in two rooms. They were so arranged as to make it necessary for anyone going in or out to pass the bed in which he, the sheriff, was sleeping. The outside doors were locked, and inside closed. And further on the first day the jury were taken to the hotel, and the table in the dining room not being of sufficient length to accommodate the twelve jurors and the sheriff, they consequently ate in sections, no one being at the table with them, and while the first half were eating the other remained on the porch outside the dining room in partial view of each other, there being both a door and a window connecting the two, and the sheriff was in a position to have control of the entire number. Also the toilet was at the rear of the residence and would be visited by only a few of the jurors at a

time while the other members remained in the front yard, a distance of possibly 25 steps, and the sheriff maintained a position between the two parties whereby he could see all that was going on—at least outside the toilet, and it does not appear that anyone else visited there while the jurors were inside. The judgment was affirmed.

The court further says in French v. Commonwealth, *supra*:

"This safeguard of the ancient law, alike vitally important to the state and to the accused, must not be impaired or frittered away; . . . it must yet, in all cases of separation be shown clearly by the state that no opportunity has been afforded for the exercise of improper influences on the juror."

Referring again to 197 Ky. 393, we find the following:

"This principle runs through all the decisions cited and the burden is at all times on the Commonwealth to sustain it. But, when as in this case, the separation is one of necessity or is temporary only and all the facts and circumstances indicate that no communication by outsiders was had with the jury, and no opportunity afforded for them to be influenced in any way, the affidavits of the jurors are sufficient to overcome the burden; and when such are filed, all the cases hold that such separation will not affect the verdict, and in this way the various decisions quoted may be reconciled."

See also 16 C. J. 1075.

In this case it would seem: First, that this separation of the jury was absolutely necessary and imperative; that juror White was ill and unable to leave his bed, and that practically all of the other jurors were compelled to comply with the call of nature and forced to seek a proper and convenient place therefor. Second, that before leaving, the sheriff exercised every possible care and diligence to prevent any communication whatever with the jury left behind; he carefully locked the door to the room, and as further seen by his affidavit, they were absent only about ten minutes. Third, that it was just daylight when they left and at a time when none of the inhabitants of the village were astir and could not well have been aware that any separation of the jury had occurred. Fourth, that upon their return to the hotel the sheriff in his affidavit states that he found White in his room in bed, with the door locked, making it a phy-

sical impossibility for him to have been communicated with.

Therefore, we must arrive at the inevitable conclusion that the separation of the jury was a necessity and not for the sake of comfort or pleasure, and that the rights of the accused could have been in no wise injured or jeopardized by this separation.

The judgment is affirmed.