### McELFRESH et al. v. COMMONWEALTH.

Court of Appeals of Kentucky.

Nov. 2, 1951.

498

Jay W. Harlan, Danville, T. J. Underwood, Lancaster, John Y. Brown, Harry B. Miller, Lexington, for appellants.

A. E. Funk, Atty. Gen., Squire N. Williams, Jr., Asst. Atty. Gen., for appellee.

MOREMEN, Justice.

Appellant, Harry McElfresh, age 66, and his son, appellant, Earl McElfresh, age 19, were convicted of the murder of Raleigh Simpson. Harry McElfresh's punishment was fixed at life imprisonment, and his son was sentenced to death.

Appellants assign three grounds for reversal and insist that the court erred (1) in not granting a continuance; (2) in permitting the coat or jacket of decedent to be exhibited to the jury; and (3) in refusing a new trial after it was learned that the jury had separated.

On the day before the fatal encounter, a quarrel had developed. Simpson and Harry McElfresh were heard to discuss an incident that had occurred at the home of decedent, who warned Earl to stay away from his home. That night (Saturday) Earl was riding in a car, driven by Logan Rousey, and accompanied by Opal Marie Cunningham and Ollie Mae Sinkhorn, when the decedent, who was riding in a truck, attempted to flag them down. Logan Rousey did not stop his car and proceeded to Danville where the truck overtook them. This time, Rousey's car was stopped, and Simpson approached and told Earl that he was going to whip him—to get out; that he couldn't sleep; that he had to get it off his chest. When Earl refused to get out, Simpson asked him to come to the Coffee Pot Service Station at 9 o'clock the next morning. Simpson returned to his truck, but a little farther down the street he again flagged Rousey's car and this time asked Earl if he had made up his mind to fight. Earl replied that he had not.

The next morning, Earl McElfresh, who was openly wearing a hunting knife on his belt, met Simpson at the service station. Harry McElfresh, who had heard of the trouble between them, went to the station also. No fight occurred there, although Earl and Simpson talked to each other, and the parties separated.

Harry and Earl McElfresh got into a car being driven by Clifton Elders and drove along the White Oak Pike (the road upon which they lived) until they reached the home of Harry's son-in-law, Richie, where both passengers got out of the car. Elders drove the car down the road a piece, turned around, came back to the Richie house and Earl sat down on the fender of the car. McElfresh, Sr., went to the rear of the house.

In a short time, Simpson arrived with Elmer (sometimes called Jake) Rousey and Virgil Young, who was driving the car. Simpson got out of the car and started towards Earl. The evidence is not certain as to whether Earl made his stand beside the car or moved to the center of the road, but

they clinched as if they were wrestling. Harry McElfresh came on to the scene of combat and he and Rousey engaged in a scuffle. Witnesses differed as to where this fight took place and also concerning whether the father joined in the combat between decedent and his son, but the proof is plain that Simpson received four or five deep wounds under his left arm, a deep wound near his neck, a deep wound about the middle of his back, and other cuts—eleven or twelve in all. After decedent fell, Rousey put him in his automobile and, with Young, carried him to a doctor's office where he was pronounced to be dead.

Subsequent conclusions set forth in this opinion have relieved us of our duty to discuss the first point argued by appellants.

■ Appellants' second contention is that the court erred in permitting the jacket of decedent to be exhibited to the jury. Bloodstained articles of clothing are admissible in evidence when they serve to assist the jury in solving some material issue which may be in doubt. However, the inherently inflammatory nature of such objects has caused the courts to restrict their introduction to cases where they are relevant to a material issue and are not merely cumulative of a fact which has been proved, or which has not been denied. Even when such garments are admissible in evidence, it must be established, as a condition precedent, that the article is in substantially the same condition as at the time of the offense. We so held in the case of Albertson v. Commonwealth, 308 Ky. 294, 214 S.W.2d 394, 396, saying: "Upon another trial, if there be one, no bloody and soiled clothing of the Denneys should be submitted to the jury unless it be shown that such clothing was in the same condition as it was when it was taken from their bodies."

In the case of Webster v. Commonwealth, 223 Ky. 369, 3 S.W.2d 754, 756, we indicated that, in addition, if a garment was handled by a number of persons, it was required to show that no change had occurred in the condition of the garment while it was in the possession of each person, and said: "The proof showed that the coroner, on the night of the homicide, took the clothing off the body, and turned it over to the dead man's father. The sheriff had possession of the clothing at the trial, and how long he had had it did not appear, or who had had it before he got it. There was no proof that the clothing introduced before the jury was in the same condition as on the night of the homicide. This was essential."

■ We do not find in this record even a delicate skein of events that ties the bloody jacket to the body of the dead man. Oscar Berger stated that he cut it from the body after it had become cold, but he does not explain how much of the cutting of the coat resulted from the fight or how much was done by the witness in removing it from the body. The slashed garment, in the absence of an explanation concerning the method he used, could create the impression that appellant had been more violent than he may actually have been. Berger failed to state where he was; why he removed the coat, or to whom he delivered it. J. L. Schlacter testified he obtained the jacket from a car belonging to Elmer Rousey, but here, again, the time, place, or reasons for taking the coat, are not given. It is not even certain that a car belonging to Rousey was near the scene of the fight, or that the body of the decedent was ever in such a car.

Virgil Young testified that he took Rousey and Simpson from the Coffee Pot Service Station to the scene of the crime and apparently it was in this car that the body was taken to the doctor's office after the fight. So here we have a break in the thread of events and uncertainty concerning the whereabouts of the coat during a very important period. The deputy sheriff who introduced the coat at the trial testified that he had received it from Schlacter, but we do not know when it was delivered to Schlacter or how long he had it in his possession. All of these witnesses testified that the coat was in the same condition as it was when each received it, but we have in this record a period of time which is unexplained and during which the possession is not fixed. No one testified concerning whether or not there was a change in the condition of the

garment during this unexplained period and no one explained satisfactorily the slashed condition of the garment. We are of opinion that this break in the link of circumstances destroys the right of the Commonwealth to introduce the garment. Furthermore, we do not believe that the introduction of the garment was relevant to a material issue because its only purpose could have been to accumulate proof concerning the size and kind of knife wounds, which had already been definitely proven by competent testimony.

Finally appellant complains because a new trial was not granted when it was shown that the jury had separated. After the court had adjourned for the first evening, J. S. Best was deputized and placed in charge of the jurors. They went to the Gilcher Hotel where seven separate rooms, which were adjoining but not connected, were obtained. The jurors were placed two to a room in six of them and the deputy sheriff in the seventh. The doors locked from the inside only. Best retired about midnight and went to sleep, and from then until 5:00 or 6:00 o'clock in the morning, no one observed what any of the jurors were doing. Sec. 244 of the Criminal Code of Practice provides in part: "On the trial of offenses which are or may be punished capitally or by life imprisonment the jurors after they are accepted, if all of the same sex, shall not be permitted to separate, but shall be kept together, in charge of the proper officers."

In the case of Wilson v. Commonwealth, 243 Ky. 333, 48 S.W.2d 3, 4, it was said: "A substantial performance of the duty resting upon the officers in charge of a jury is sufficient, as where he remained in such convenient situation as to observe and prevent any attempt to tamper with the jury or any irregularity on their part. That duty was held to have been performed where the jury was kept in adjoining and connected apartments and the officer was in the same or adjoining or connected room. Commonwealth v. Shields, 2 Bush 81, 65 Ky. 81. In Minor v. Commonwealth, 5 Ky. Law Rep. 176, 12 Ky.Op. 211, it was held that the lodging of the jury at a hotel in different rooms along the same hall in which the sheriff locked them at night, and it was shown there had been no tampering with the jury, was a sufficient compliance with the requirements of the Code. Such is this record. In Adkins v. Commonwealth, 197 Ky. 385, 247 S.W. 26, this subject and the cases on it are reviewed. It was held in that case that there was no separation requiring a reversal of the judgment where the jury was kept at the residence of the jailer, quartered in two rooms so arranged as to require any one going in and out thereof to pass the bed in which the officer was sleeping, and it appeared that there was no communication between the jurors and any one else."

It will be noted that in each of the above instances, there was security of a higher grade than that which appears in the instant record because here the deputy did not remain in a convenient situation so as to observe any attempt to tamper with the jurors. He locked himself in his room. He did not lock them in their rooms. The jurors locked their doors from the inside and were free to unlock them at any time. There was no arrangement whereby it was necessary to pass the officer's bed before communicating with the outside world. We have held consistently that error has been committed in cases of jury separation where there has been opportunity afforded for the exercise of improper influence on one or more jurors. Wells v. Commonwealth, 313 Ky. 371, 231 S.W.2d 30. Where there has been a separation we have held it is incumbent on the Commonwealth to show that no opportunity has been afforded for the exercise of improper influence. Gay v. Commonwealth, 303 Ky. 572, 198 S.W.2d 308. We believe that the proof offered by the Commonwealth is not of the quality which may support its burden. The affidavits of the jurors alone are not sufficient because it is difficult to conceive of a juror of the character who would submit to outside influence doing other than denying the act upon subsequent examination.

The judgment is reversed with directions that appellants be granted a new trial.